**BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
fbottini@bottinilaw.com
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002

**RENNE PUBLIC LAW GROUP**
Louise H. Renne (SBN 36508)
lrenne@publiclawgroup.com
Ruth M. Bond (SBN 214582)
rbond@publiclawgroup.com
Ryan McGinley-Stempel (SBN 296182)
rmcginleystempel@publiclawgroup.com
350 Sansome Street, Suite 300
San Francisco, California 94101
Telephone: (415) 848-7200
Facsimile: (415) 848-7230

*Attorneys for Plaintiff Kathleen Dinsmore*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| KATHLEEN DINSMORE, derivatively on behalf of ORACLE CORPORATION and ORACLE AMERICA, INC.,<br>Plaintiff,<br><br>vs.<br><br>LAWRENCE J. ELLISON, SAFRA A. CATZ, JEFFREY O. HENLEY, JEFFREY S. BERG, MICHAEL J. BOSKIN, BRUCE R. CHIZEN, GEORGE H. CONRADES, RONA A. FAIRHEAD, RENÉE J. JAMES, CHARLES (WICK) MOORMAN IV, LEON E. PANETTA, WILLIAM G. PARRETT, NAOMI O. SELIGMAN, VISHAL SIKKA, and DOES 1–30,<br>Defendants,<br><br>– and –<br><br>ORACLE CORPORATION and ORACLE AMERICA, INC.,<br>Nominal Defendants. | Case No. _______________<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR:**<br>**1. BREACH OF FIDUCIARY DUTY;**<br>**2. AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br>**3. ABUSE OF CONTROL;**<br>**4. UNJUST ENRICHMENT; AND**<br>**5. VIOLATION OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934.**<br><br>**DEMAND FOR JURY TRIAL** |

## Table of Contents


I. INTRODUCTION ....................................................................................2

II. NATURE AND SUMMARY OF THE ACTION ......................................................5

III. JURISDICTION AND VENUE....................................................................12

IV. INTRADISTRICT ASSIGNMENT ................................................................13

V. THE PARTIES........................................................................................13

A. Plaintiff ............................................................................................13

B. Nominal Defendants ...........................................................................13

C. Executive Officer Defendants...............................................................13

D. Director Defendants.............................................................................14

E. Doe Defendants ...................................................................................17

F. Unnamed Participants...........................................................................17

VI. RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS........18

A. Responsibilities of the Individual Defendants...........................................18

B. Fiduciary Duties of the Individual Defendants.........................................20

C. Breaches of Fiduciary Duties by the Individual Defendants........................20

D. Conspiracy, Aiding and Abetting, and Concerted Action...........................21

E. The Directors' Roles and Committees at Oracle.........................................22

VII. SUBSTANTIVE ALLEGATIONS...............................................................23

A. Oracle's CEO and Key Executive Team.....................................................24

B. At All Relevant Times, the Individual Defendants Have Had Actual Knowledge that Oracle Has Repeatedly Violated Anti-Discrimination Laws, and That Oracle Has Failed to Comply with Its Own Policies of Promoting Diversity and Prohibiting Discrimination, Yet the Individual Defendants Have Continued to

Refuse to Nominate Black Individuals and Minorities to the Board, Resulting in Congressional Inquiries ....29

C. False and Misleading Statements Made by the Director Defendants in Oracle's Proxy Statements ....34

D. Oracle's Nominating and Corporate Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board ....53

E. The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination ....55

F. The Board Has Breached Its Duties by Failing to Ensure an Independent Chairman ....58

G. The Director Defendants Have Breached Their Duties by Continually Rehiring Ernst & Young as the Company's Auditor, Despite Its Failure to Do Its Job ....59

H. The Individual Defendants Breached Their Duties of Loyalty and Good Faith by Causing Oracle to Intentionally Breach Its Obligations Under a Settlement Agreement Related to the Departure of Mark Hurd from Hewlett Packard, Resulting in a Massive $3.0 Billion Judgment Against the Company....62

I. The Unjust Compensation Awarded to the Individual Defendants ....62

VIII. THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES ....73

IX. DEMAND FUTILITY....75

A. Demand Is Futile Against the Officer Defendants ....76

B. Demand Is Futile Against a Majority of the Board Who Are Not Officer Defendants Due to a Lack of Independence, Because Ellison Controls Oracle and Its Board ....76

C. A Majority of Directors Have Material Ties to Ellison Rendering Them Incapable of Assessing Demand Against the Officer Defendants ....80

1. Defendant Catz ....................81

2. Director Henley ....................83

3. Director James ....................83

4. Director Seligman ....................84

5. Director Conrades ....................86

6. Director Berg ....................87

7. Director Boskin ....................88

8. Director Chizen ....................90

9. Director Garcia-Molina ....................91

10. Director Panetta ....................91

X. CAUSES OF ACTION ....................93

XI. PRAYER FOR RELIEF ....................98

Plaintiff Kathleen Dinsmore ("Plaintiff") submits this Verified Shareholder Derivative Complaint against certain directors and officers of nominal defendants Oracle Corporation and Oracle America, Inc. (together, "Oracle" or the "Company") for, *inter alia*, violations of the Securities Exchange Act of 1934 ("Exchange Act"), breaches of fiduciary duties, and unjust enrichment. In support of these claims, Plaintiff alleges the following upon (1) personal knowledge with respect to the matters pertaining to herself; and (2) information and belief with respect to all other matters, based upon the investigations undertaken by counsel, which include a review of Oracle's legal and regulatory filings, press releases, analyst reports, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I. INTRODUCTION

*"**Diversity and inclusion in our workforce starts at the top**."*

*See* Oracle's 2019 Proxy Statement at 61.

1. Despite this platitude in its proxy statement, Oracle has failed to create any meaningful diversity at the very top of the Company — the Board of Directors (the "Board"). The Oracle Board has lacked diversity at all relevant times, and is one of the few remaining publicly-traded companies without a single African American director. The following are the current members of the Board:

**Lawrence J. Ellison**



**Safra A. Catz**



**Jeffrey O. Henley**



**Jeffrey S. Berg**



**Michael J. Boskin**



**Bruce R. Chizen**



**George H. Conrades**



**Rona A. Fairhead**



**Renée J. James**



**Charles (Wick) Moorman IV**



**Leon E. Panetta**



**William G. Parrett**



**Naomi O. Seligman**



**Vishal Sikka**



## II. NATURE AND SUMMARY OF THE ACTION

2. Actions speak louder than words. If Oracle simply disclosed that it does not want any Black individuals on its Board, it would be racist but honest. But Oracle's Directors, wishing to avoid public backlash, have done the opposite — they have repeatedly made gross misrepresentations in the Company's public statements by claiming to have a multitude of policies, internal controls, and processes designed to ensure diversity both at the management level and the Board itself.

3. These policies, however, are not worth the paper they are printed on. At Oracle, it is "Do As I Say, Not As I Do." Oracle's Board, which has no Black individuals, has consciously failed to carry out Oracle's written proclamations about increasing diversity in its ranks. The Board, as well as the Company's executive officers, remain devoid of Black people and other minorities. In short, Oracle remains one of the oldest and most egregious "Old Boy's Club" in Silicon Valley. A sign advising applicants "Blacks Need Not Apply" might as well hang at the entrance to the Company's headquarters at 500 Oracle Parkway in Redwood Shores, California.

4. Oracle's Directors have deceived stockholders and the market by repeatedly making false assertions about the Company's commitment to diversity. In doing so, the Directors have breached their duty of candor and have also violated the federal proxy laws. Their conduct has also irreparably harmed Oracle. For those who care about diversity, inclusion, and honesty, those who do not adhere to these principles should be boycotted, especially if the perpetrator is one of the largest and most influential corporations in Silicon Valley.

5. Every business entity -- whether publicly traded or not -- has certain legal obligations and responsibilities to its shareholders, customers, investors, and the public. These responsibilities include the obligation to be truthful and honest; to actually implement the policies and procedures that it represents it has adopted; and to not engage in racial discrimination, whether it is in its workforce or leadership positions. Oracle has failed on all counts.

6. Founded in 1977, Oracle's Board today in 2020 has no African-Americans and no Latinos; and no Asian-American or other minority representatives aside from Vishal Sikka. And, none are in the offing.

7. This lawsuit is therefore about deception and a lack of truthfulness and effort on the part of the Board to fulfill their fiduciary duties which has resulted in racial discrimination in its leadership positions and otherwise to the detriment of the Oracle shareholders.

8. Despite at least two Congressional inquiries into the lack of diversity on Oracle's Board, and a Department of Labor ("DOL") lawsuit claiming Oracle's discrimination against minorities that resulted in at least $400 million in underpaid salaries, Oracle persists in its refusal to fix its glaring racial disparities. Oracle stands alone in the basement of just a handful of publicly-traded companies that have earned the dubious distinction of having not a single Black person on its board. In short, Oracle's culture and top ranks are permeated with a backwater attitude about diversity. And Oracle's problem is not just outdated views from a bygone era; statistics don't lie, and Oracle's Board and workforce reveal one of the lowest prevalence of Black individuals and minorities in Silicon Valley.

9. As one article commenting on the Congressional inquiries into the lack of diversity at Oracle noted:

> ***Oracle should increase the racial diversity of its board, a group of U.S. lawmakers said,*** putting a spotlight on the company's hiring and management practices.
>
> "***The fact that African Americans make up 13% and Asian Americans make up 5.6% of the U.S. population but 0% of Oracle's board and leadership team is inexcusable,***" the lawmakers said in a Nov. 22 letter from the House Tech Accountability Caucus and Tri-Caucus, which includes the Black, Hispanic and Asian Pacific American caucuses.
>
> It's the latest call for the second-largest software maker and billionaire Chairman Larry Ellison to improve diversity and inclusion. Former employees and the U.S. government have sued the Redwood City, California-based company, alleging it systematically underpaid women and people of color, and many shareholders have supported repeated requests that the board examine if there's a pay gap between male and

> female employees.
>
> It's at least the second time this year that Oracle has attracted congressional scrutiny for its diversity practices. In January, the Congressional Black Caucus and House Tech Accountability Caucus wrote to the company expressing dismay about allegations of pay discrimination.
>
> This week's letter was signed by Democrats Robin L. Kelly, Joaquin Castro, Karen Bass and Judy Chu, who chair the various House caucuses, as well as other lawmakers.

*See* Anders Malin, *Oracle's Largely White Board Draws Congressional Scrutiny*, SEATTLE TIMES, Nov. 22, 2019.

10. The article discussing the Congressional inquiry also noted:

> ***Oracle is also contending with a January lawsuit from the U.S. Department of Labor, which alleged the company short-changed female and minority workers some $400 million in wages***.
>
> The allegations stem from a 2014 audit by a department unit that enforces equal pay and other non-discrimination matters for federal contractors. Records show that ***Oracle paid women and minority employees less than others and steered them into lower-level jobs, the department said in court papers***. It also alleged that Oracle used H-1B visas to hire scores of Asians and paid them less than employees who were U.S. citizens.
>
> In 2017, three female engineers sued Oracle, alleging underpayment compared with male engineers doing the same tasks. An analysis conducted on behalf of the plaintiffs showed the company paid some women about $13,000 less per year on average versus male counterparts. They're seeking to represent more than 4,000 similarly situated employees.
>
> Oracle has denied the allegations in both cases.
>
> ***For three straight years, shareholder Pax World Funds has filed proposals asking the company's board to identify whether a gender pay gap exists and how to fix it***. The proposals have been supported by several large investors, including funds held by BlackRock Inc. and State Street Corp., but failed to garner majority support. That's largely because Ellison, who owns about a third of the stock, has opposed the measure.[1]

11. Platitudes in proxy statements are not progress. Simply put, Oracle has no *real* commitment to diversity and its Board is turning a blind eye to the Company's

[1] *See* Anders Malin, *Oracle's Largely White Board Draws Congressional Scrutiny*, SEATTLE TIMES, Nov. 22, 2019.

miserable failure to ensure the "diversity" trumpeted by the Directors in Oracle's filings with the Securities and Exchange Commission ("SEC") and its annual reports to shareholders.

12. The Director Defendants named herein all signed each of Oracle's annual proxy statements. With such signatures come an obligation to ensure that the statements in the Proxy were true and accurate, and to correct any misleading statements. They failed to do so.

13. As demonstrated herein, the Defendants knew of, but failed to disclose, fraudulent business practices at Oracle that put the Company at material risk — namely, discriminatory hiring and compensation practices. Had this information been disclosed, shareholders would not have voted to reelect Board members, approve executive compensation packages, and reject an independent Board chairman.

14. The time for change has come. If Oracle's directors want to continue to be part of the problem, not the solution, then they at least need to be held liable for their breaches of fiduciary duties to the Company's stockholders. If, on the other hand, they want to be part of real change, they hold the keys themselves. They can (and should), stand up and exercise the control of Oracle that they possess to make change NOW.

15. The shareholder derivative lawsuit has been the only judicial mechanism for shareholders to hold directors accountable for engaging in wrongdoing. Like the United State Supreme Court, California courts have long recognized that derivative suits play an important role in corporate governance where directors fail to do their jobs:

> The derivative action is practically the only remedy for calling the management to account for its wrongs against the corporation and to obtain restitution. Where a derivative suit is against outsiders for wrongs against the corporation the directors can usually be expected to decide impartially on the advisability of suing. But the management cannot be expected to sue themselves for their own misdeeds.

*Pearce v. Super. Ct.*, 149 Cal. App. 3d 1058, 1065 (1983); *see also Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 297 (2004); *accord Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949)). As the

California Supreme Court recognized in *Jones v. H. F. Ahmanson & Co.*, where, as here, the company's board and management fail to perform their duties, stockholders have a "right" to bring derivative actions. *See* 1 Cal. 3d 93, 107 (1969). The courts of Delaware, Oracle's state of incorporation, likewise acknowledge that derivative actions serve an important function: "The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

16. Plaintiff, derivatively on behalf of Oracle, seeks the following relief from the Director Defendants:

(a) At least three of Oracle's directors should immediately resign prior to the Company's annual meeting which is scheduled for November 2020 and should insist that the Company nominate three new persons to serve in their stead, which applicants should include two Black persons and one other minority;

(b) All Director Defendants named in this suit should return all their 2020 compensation received from Oracle (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Black people and minorities in corporate America;

(c) Oracle should agree to publish an annual Diversity Report that contains particularized information about the hiring, advancement, promotion, and pay equity of all minorities at Oracle;

(d) Oracle should replace Larry Ellison as non-executive Chairman of the Board; Ellison is not independent, and the lack of a truly independent non-executive Chairman at Oracle has been a big part of the reason Oracle has not sufficiently made any real progress at achieving diversity;

(e) Oracle should create a $700 million fund to hire Black individuals and other minorities, promote minorities to more management positions at the

Company, establish and maintain a mentorship program at Oracle for minorities that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(f) Oracle should require annual training of its entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, as well as other relevant topics;

(g) Oracle should immediately set specific goals with respect to the number of Black individuals and minorities to hire at the Company over the next five years, and Oracle should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals; and

(h) Oracle should replace Ernst & Young ("E&Y") as its auditor. Oracle is one of E&Y's largest customers, and E&Y has served as Oracle's auditor ***since 2002***, giving rise to a cozy and clubby relationship between E&Y and Oracle which is not conducive to effective auditing. The Company's compliance with its stated policies concerning the alleged commitment to diversity has been abysmal to the point of being basically non-existent. The very purpose of an auditor is to assess the Company's internal controls and determine if they are functioning effectively. Rather than doing so, E&Y has wrongfully and consistently given Oracle's internal controls a clean bill of health and has failed to point out the obvious – that Oracle lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

17. The Individual Defendants' misconduct has caused severe financial and reputational damage to Oracle. The governmental lawsuits which allege racial

discrimination seek hundreds of millions of dollars in back pay for affected minorities, including Black individuals:

> A U.S. Department of Labor Office of Federal Contract Compliance Programs (OFCCP) filing on Jan. 25 alleged Oracle discriminated against black, Asian and female employees, as well as international workers with visas, funneling them into lower-paying roles and ***ultimately underpaying them to the tune of $400 million dollars***.
>
> The OFCCP, which enforces equal pay and ensures government contractors comply with anti-discrimination legislation, states: Oracle "impermissibly denies equal employment opportunity to non-Asian applicants for employment, strongly preferring a workforce that it can later underpay. Once employed, women, Blacks and Asians are systematically underpaid relative to their peers." The practice allegedly goes back to 2013.[2]

18. While systematically underpaying minorities and women, Oracle's CEOs have used the money saved to pay themselves unfathomable amounts. Defendants Ellison and Catz are at the top of the list of the 100 highest paid CEOs. They both made $108 million each in one year—*more than a thousand times greater than the average worker's salary*. Meanwhile it has taken five years for Oracle's stock to crawl from $40 to $50 per share.

19. In addition to these transgressions, the Director Defendants have abdicated their fiduciary duties by allowing Defendant Ellison to engage in a personal vendetta against Hewlett-Packard that had no business purpose, lacked any objective or legal justification, and has resulted in a $3 billion judgment against Oracle. The Director Defendants were well aware that Ellison was risking extreme financial prejudice to the Company by improperly pursuing this personal vendetta, and yet consciously failed to curtail Ellison's improper conduct, thus causing massive damages to Oracle. In so doing, the Director Defendants and Ellison have breached their duties of loyalty and

[2] *See* Sharon Florentine, *Oracle the Latest to Face Pay Discrimination Lawsuit*, CIO, Feb. 1, 2019.

good faith to the Company.

20. As set forth below, Defendants' conduct constitutes bad faith and disloyal acts, giving rise to claims that fall outside the scope of the business judgment rule and outside of permissible indemnification by Oracle. As a result, all members of the Board face a substantial likelihood of liability and any demand on them to bring this case would be a futile and useless act.

## III. JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder. The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

22. This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23. This Court has jurisdiction over Defendants. Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice. Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets. The Court has jurisdiction over Oracle because Oracle is headquartered in Redwood Shores, California and has substantial business operations in California.

24. Venue is proper in this District pursuant to Section 27 of the Exchange Act.

Venue is also proper under 28 U.S.C. § 1391(b) because: (a) Oracle maintains its principal place of business in this District; and (b) many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

## IV. INTRADISTRICT ASSIGNMENT

25. In compliance with Local Rule 3-2(b), Plaintiff requests that this action be assigned to the San Francisco Division of this District because a substantial part of the events or conduct giving rise to the claims in this action occurred in the County of San Mateo.

## V. THE PARTIES

### A. Plaintiff

26. Plaintiff Kathleen Dinsmore is a current shareholder of Oracle, and has continuously held Oracle stock at all relevant times, and since approximately 2001.

### B. Nominal Defendants

27. Oracle Corporation is a Delaware corporation with its headquarters at 500 Oracle Parkway, Redwood Shores, California 94065. Oracle's wholly owned subsidiary, Oracle America, Inc., is an American multinational computer technology company that designs, manufactures, and markets network computing infrastructure solutions. The Company offers data storage products, cloud platform, databases, microprocessors, software desktop systems, developer software, infrastructure management software, and other related products and solutions.

### C. Executive Officer Defendants

28. Defendant Lawrence J. Ellison is the chairman of Oracle Corporation and chief technology officer ("CTO"). He founded the Company in 1977 and served as chief executive officer ("CEO") until September 2014. Ellison lives in Woodside, California which is part of San Mateo County.

29. Defendant Safra A. Catz has served as CEO of Oracle Corporation since

2014 and a member of the Company's Board since 2001. She previously served as president of Oracle, and has also served as the Company's chief financial officer. Prior to being named president, Catz held various other positions since starting at Oracle in 1999.

30. Defendant Jeffrey O. Henley is vice chairman of Oracle Corporation. He served as Oracle's chief financial officer and an executive vice president from 1991 to 2004, and has been a member of Oracle's Board since 1995. Henley was chairman of Oracle from 2004 until 2014. He also serves on Oracle's Executive Management Committee.

**D. Director Defendants**

31. Defendant Jeffrey S. Berg was a member of the Oracle Board during all relevant times. Berg has served as a Senior Sales Director of Oracle Cloud Management Services from May 2003 to March 2012. He has served as chairman of Northside Services, LLC, a media and entertainment advisory firm, since 2015. He was chairman of Resolution, a talent and literary agency he founded, from 2013 until 2015.

32. Defendant Michael J. Boskin was a member of the Oracle Board during all relevant times. Boskin is the Tully M. Friedman Professor of Economics and Wohlford Family Hoover Institution Senior Fellow at Stanford University, where he has been on the faculty since 1971. He is CEO and president of the consulting firm Boskin & Co., Inc. Boskin was chairman of the President's Council of Economic Advisers from 1989 until 1993. He currently serves as a director of Bloom Energy Corporation and previously served as a director of ExxonMobil.

33. Defendant Bruce R. Chizen was a member of the Oracle Board during all relevant times. Chizen is currently an independent consultant and has served as senior adviser to Permira Advisers LLP since 2008 and as a venture partner at Voyager Capital since 2009. He has also served as an operating partner at private equity fund Permira Growth Opportunities since June 2018.

34. Defendant George H. Conrades was a member of the Oracle Board during

all relevant times. Conrades has served as an executive advisor to Akamai Technologies, Inc., a content delivery network services provider for media and software delivery and cloud security solutions, since June 2018. He previously served as Akamai's CEO from 1999 to 2005 and chairman from 1999 to March 2018.

35. Defendant Rona A. Fairhead was a member of the Oracle Board during all relevant times. Fairhead served as Minister of State for Trade and Export Promotion for the United Kingdom Department for International Trade from September 2017 to May 2019. Previously, Fairhead served as chair of the British Broadcasting Corporation Trust (BBC) from 2014 to 2017. From 2006 to 2013, she was chair and chief executive officer of the Financial Times Group Limited, which was a division of Pearson plc, and, prior to that, she served as Pearson's chief financial officer. Before joining Pearson, Fairhead held a variety of leadership positions at Bombardier Inc. and Imperial Chemical Industries PLC. She has previously served as a director of HSBC Holdings plc and PepsiCo, Inc.

36. Defendant Renée J. James was a member of the Oracle Board during all relevant times. James is currently the chairman and CEO of Ampere Computing, a company she founded in 2017, which produces high-performance semiconductors for hyperscale cloud, storage, and edge computing. James also serves as an operating executive for The Carlyle Group, a global alternative asset manager. In her role with Carlyle, James evaluates new technology investments for the firm as well as advises portfolio companies on their strategic direction and operational efficiency.

37. Defendant Charles (Wick) Moorman IV was a member of the Oracle Board during all relevant times. Moorman is currently a senior advisor to Amtrak, where he previously served as president and CEO from August 2016 until January 2018. Prior to that and until 2015, Moorman was CEO (from 2005) and chairman (from 2006) of Norfolk Southern Corporation. From 1975 to 2005, he held various positions in operations, information technology, and human resources at Norfolk Southern Corporation. Moorman serves as a director of Chevron Corporation and previously

served as a director of Duke Energy Corporation and Norfolk Southern Corporation.

38. Defendant Leon E. Panetta was a member of the Oracle Board during all relevant times. Panetta served as United States Secretary of Defense from 2011 to 2013 and as Director of the Central Intelligence Agency from 2009 to 2011. Prior to that, Panetta was a member of the United States House of Representatives from 1977 to 1993, served as Director of the Office of Management and Budget from 1993 to 1994, and served as former President Bill Clinton's Chief of Staff from 1994 to 1997. Panetta is the cofounder and chairman of the Panetta Institute for Public Policy and currently serves as moderator of the Leon Panetta Lecture Series, a program he created. He previously served as Distinguished Scholar to Chancellor Charles B. Reed of the California State University System and professor of public policy at Santa Clara University.

39. Defendant William G. Parrett was a member of the Oracle Board during all relevant times. Parrett served as the chief executive officer of Deloitte Touche Tohmatsu, a multinational professional services network, from 2003 until 2007. He joined Deloitte in 1967 and served in a series of roles of increasing responsibility until his retirement in 2007. Parrett serves as a director of The Blackstone Group L.P. and the Eastman Kodak Company. He previously served as a director of Conduent Inc., Thermo Fisher Scientific, UBS Group AG, and IGATE Corporation. Parrett is a Certified Public Accountant with an active license.

40. Defendant Naomi O. Seligman was a member of the Oracle Board during all relevant times. Seligman is a senior partner at Ostriker von Simson, a technology research firm that chairs the CIO Strategy Exchange. Since 1999, this forum has brought together senior executives in four vital quadrants of the IT sector. From 1977 until 1999, Seligman served as a cofounder and senior partner of Research Board, Inc., a private-sector institution sponsored by 100 chief information officers from major global corporations. She previously served as a director of Akamai Technologies, Inc., IGATE Corporation, and Dun & Bradstreet.

41. Defendant Vishal Sikka was a member of the Oracle Board during all relevant times. Sikka is the founder and CEO of Vianai Systems, Inc., a startup company that provides advanced software and services in artificial intelligence and machine learning. Previously, he was the CEO and Managing Director of Infosys Limited from 2014 to 2017 and a member of the Executive Board of SAP SE from 2002 to 2014. Sikka holds a PhD in artificial intelligence from Stanford University and serves on the Supervisory Board of BMW Group and on the Advisory Council for the Stanford Institute for Human-Centered Artificial Intelligence.

42. The defendants identified in paragraphs 28 through 30 are referred to herein as the "Executive Officer Defendants." The defendants identified in paragraphs 31 through 41 are referred to herein as the "Director Defendants." Collectively, all defendants are referred to herein as the "Individual Defendants."

**E. Doe Defendants**

43. Except as described herein, Plaintiff is ignorant of the true names of defendants sued as Does 1 through 30, inclusive, and therefore, Plaintiff sues these defendants by such fictitious names. Following further investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants are Oracle officers, other members of management, employees, and/or consultants or third parties who were involved in the wrongdoing detailed herein. These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

**F. Unnamed Participants**

44. Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein. The individuals and entities

acted in concert by joint ventures and by acting as agents for principals, to advance the objectives of the scheme and to provide the scheme to benefit defendants and themselves to the detriment of Oracle.

## VI. RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS

### A. Responsibilities of the Individual Defendants

45. Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.

46. Board Members and Executive Officers are held to the highest level of ethics and compliance with the law.

47. The Company's Corporate Governance Principles state that "All directors are expected to comply with the Oracle Code of Ethics and Business Conduct."

48. The Company's Code of Ethics and Business Conduct states that:

> We base personnel actions strictly on individual ability, performance, experience, and company need. We avoid actions influenced by personal relationships and discriminatory practices of any kind. Our goal is to compensate personnel—with wages, salaries, and other benefits — in relation to their responsibilities, performance, and experience. Oracle is also committed to adhering to wage, hour, and minimum-age guidelines provided by applicable laws. We strive to structure the content of jobs so that work provides personal satisfaction and challenge.

49. The Company's Corporate Governance Principles state:

> The Board is also responsible for overseeing management's efforts to assess and manage material risks and for reviewing options for risk mitigation. The Board reserves oversight of the major risks facing Oracle and may delegate risk oversight responsibility to committees of the Board.

50. The Board is responsible for oversight and compliance with the Company's internal controls regarding diversity, anti-discrimination, pay equity, hiring and promotion. As alleged herein, the Company's Board failed to act in good faith by failing to ensure compliance with these policies and controls, which existed on paper, but were knowingly disregarded.

51. The Individual Defendants knew that the government had alleged at least by January 2017 that, going back to at least 2014, the Company paid Black employees

and other minorities less than other employees for similar jobs. Despite this knowledge, the Board did nothing.

52. The Board also obviously knew that it was all-white and lacked diversity. The Board and the Executive Officers also knew that diversity was lacking in the Company's workforce. The Defendants' knowledge of the problems is reflected by their efforts to conceal the lack of diversity and discrimination. When shareholder proposals were advanced to require the Company to publish an Equity Pay Report so that employees and shareholders would receive data and statistics about diversity and pay differences, the Defendants caused the Company to oppose the proposals and advance false reasons for the opposition, including that "Relatively few global companies have publicized their internal pay data and it does not appear to have had any additional beneficial effect. We believe the creation and publication of a pay equity report as requested by this proposal would be costly and time-consuming and, in light of our long-standing efforts in this area, would not lead to meaningful gains in support of workforce diversity and gender pay equity."[3]

53. The Board also knew that Congress had launched an inquiry into this lack of diversity. Again, the Board did nothing to address the problem after becoming aware of these serious deficiencies and violations of the law. The Board knew the Company had policies in place on paper, but they failed to give the policies any teeth or enforcement. The Board's conduct represented hypocrisy, bad faith, and disloyal conduct. The Board had a duty to cause the Company to comply with the law and its own Code of Ethics and Business Conduct, and failed to do so.

54. The direct involvement of Oracle's Board makes them interested in the outcome of this litigation because they face a substantial likelihood of liability. Demand

[3] *See* Oracle's 2019 Proxy Statement at 61.

is thus futile.

**B. Fiduciary Duties of the Individual Defendants**

55. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continue to owe Oracle and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Oracle in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Oracle and not in furtherance of their personal interest or benefit.

56. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Oracle were required to, among other things:

(a) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b) remain informed as to how Oracle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**C. Breaches of Fiduciary Duties by the Individual Defendants**

57. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Oracle, the absence of good faith on their part, and a reckless disregard for their duties to the

Company.

58. The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to cover up Oracle's discrimination, and caused Oracle to incur substantial damage.

59. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Oracle, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions. As a result, and in addition to the damage the Company has already incurred, Oracle has expended, and will continue to expend, significant sums of money.

**D. Conspiracy, Aiding and Abetting, and Concerted Action**

60. At all relevant times, the Individual Defendants were agents of the remaining Individual Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency. The Individual Defendants ratified and/or authorized the wrongful acts of each of the other Individual Defendants. The Individual Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts, plans, schemes, and transactions that are the subject of this Complaint.

61. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct, by failing to maintain adequate internal controls at

the Company and covering up discrimination at the Company.

63. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did circumvent the internal controls at the Company and cause the Company to cover up Oracle executives' discrimination. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

64. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and waste of corporate assets; and to conceal adverse information concerning the Company's operations.

65. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by intentionally circumventing internal controls at the Company and causing the Company to cover up discrimination at the Company. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

66. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**E. The Directors' Roles and Committees at Oracle**

67. The following chart sets forth the directors of Oracle as set forth in the

Company's most recent Proxy Statement and the committees on which they serve:

| Director | Finance and Audit | Compensation | Governance | Independence |
|---|---|---|---|---|
| Jeffrey S. Berg | ✓ | | ✓ | ✓ Chair |
| Michael J. Boskin | ✓ Chair | | | |
| Safra A. Catz | | | | |
| Bruce R. Chizen | ✓ | | ✓ Chair | |
| George H. Conrades | | ✓ Chair | | ✓ |
| Lawrence J. Ellison | | | | |
| Rona A. Fairhead | | | | |
| Hector Garcia-Molina | | | | ✓ |
| Jeffrey O. Henley | | | | |
| Mark V. Hurd | | | | |
| Renée J. James | | | | |
| Charles W. Moorman IV | | ✓ | | |
| Leon E. Panetta | | ✓ | ✓ | |
| William G. Parrett | ✓ | | | |
| Naomi O. Seligman | | ✓ Vice Chair | | |

## VII. SUBSTANTIVE ALLEGATIONS

68. Oracle's Board enjoys the dubious distinction of being one of only a handful of publicly-traded companies in the United States with zero Black members and zero Asian American members.

69. The lack of diversity at the top at Oracle is significant. The Board bears ultimate responsibility for ensuring the Company's compliance with federal and state laws prohibiting discrimination based on race, gender, and other factors. Diversity in

the workforce is a strong indication of a lack of discrimination; conversely, a lack of diversity provides a strong indication that discrimination is present.

### A. Oracle's CEO and Key Executive Team

70. At Oracle, not only does the Board lack a single Black member, but the Company's executive ranks also lack a single Black person: Oracle's Chief Executive Officer is Safra Catz. Oracle's key executives include Safra Catz and 40 others.

**Safra Catz**
Chief Executive Officer



**Mary Ann Davidson**
Chief Security Officer



**Greg Pavlik**
Senior Vice President, Chief Technology Officer, Oracle Cloud Platform



**Jon S. Chorley**
Chief Sustainability Officer



**Lawrence Ellison**
Chairman of the Board & Chief Technology Officer



**Dorian Daley**
Executive Vice President General Counsel & Secretary



**Jeffrey Henley**
Vice Chairman of the Board



**Edward Screven**
Chief Corporate Architect



**Douglas Kehring**
Executive Vice President, Corporate Operations



**Simon de Montfort Walker**
Senior Vice President & General Manager, Oracle Food & Beverage



**Keith Rajecki**
Vice President



**Steve Rosenberg**
Senior Vice President and General Manager, Oracle Health Science Global Business Unit



**Mike Sicilia**
Executive Vice President, Global Business Units



**Sonny Singh**
Senior Vice President & General Manager, Oracle Financial Services Global Business Unit



**Rodger Smith**
Senior Vice President & General Manager, Oracle Utilities



**Guerry Waters**
Group Vice President, Product Strategy & Marketing



**Mike Webster**
Senior Vice President & General Manager



**Bradley Williams**
Vice President, Industry Strategy, Oracle Utilities



**Vivian Wong**
Group Vice President, Higher Education Technologies



**Gretchen Alarcon**
Group Vice President, Human Capital Management Strategy



**Paco Aubrejuan**
Senior Vice President, Oracle Applications Development



**Steve Daheb**
Senior Vice President, Oracle Cloud



**Donald Deutsch**
Vice President, Standards Strategy & Architecture



**Derek Gittoes**
Vice President, Supply Chain Management Product Strategy



**William Hardie**
Vice President, Oracle Database Product Management



**Emily He**
Senior Vice President, Global Marketing, Oracle Cloud HCM



**Kash Iftikhar**
Vice President and General Manager



**Don Johnson**
Executive Vice President, Oracle Cloud Infrastructure



**Rajan Krishnan**
Group Vice President



**Chris Leone**
Senior Vice President and GM, Oracle Human Capital Management (HCM) Cloud




**Juergen Lindner**
Senior Vice President, Global Marketing, SaaS



**Juan R. Loaiza**
Executive Vice President, Mission Critical Database Technologies



**Clay Magouyrk**
Executive Vice President, Oracle Cloud Infrastructure



**Andrew Mendelsohn**
Executive Vice President,
Oracle Database Server Technologies



**Steve Miranda**
Executive Vice President,
Applications Development



**Vipin Samar**
Senior Vice President,
Database Security



**Mike Splain**
Executive Vice President,
Microelectronics



**Jason Williamson**
Vice President, Oracle for Startups & Oracle for Research



**Christopher J. Donato**
Senior Vice President,
North America Applications & Consulting



**Rich Geraffo**
Executive Vice President,
North America Cloud Technology



**Inderjeet Singh**
Executive Vice President,
ISV, OEM, & Java



**B. At All Relevant Times, the Individual Defendants Have Had Actual Knowledge that Oracle Has Repeatedly Violated Anti-Discrimination Laws, and That Oracle Has Failed to Comply with Its Own Policies of Promoting Diversity and Prohibiting Discrimination, Yet the Individual Defendants Have Continued to Refuse to Nominate Black Individuals and Minorities to the Board, Resulting in Congressional Inquiries**

71. Oracle has been consistently criticized for failing to nominate and promote Black individuals and minorities to its Board and to positions of management and power within Oracle.

72. Oracle, led by Larry Ellison and the Board, has consistently refused to appoint Black individuals and minorities to its Board and to management positions within the Company. The Company has been roundly criticized for its refusal to do so, but has persisted in its intransigence.

73. The fact that Oracle's Board has been, and continues to be, non-diverse has not escaped Congress' attention. On Friday, November 22, 2019, over 30 members of Congress slammed Oracle's lack of diversity, sending a letter to Company co-founder Larry Ellison and the Board asking for answers to questions about the Company's lack of efforts to diversify its leadership.

74. The Congressional letter to the Board stated:

> The fact that African Americans make up 13% and Asian Americans make up 5.6% of the US population but 0% of Oracle's board and leadership team is inexcusable," the letter read. "As a company that has expressed a commitment to diversity and rejected claims of intentional discrimination, you should recognize the optics of Oracle working doggedly to sell software and technology systems to businesses and congressional districts, historically black colleges and universities and minority serving institutions, and communities of color — but not work to remedy the lack of diversity on your board.

75. The letter, organized by the Congressional Black Caucus and the House Tech Accountability Caucus, noted a February 2019 commitment by the Company to not "intentionally discriminate against women and people of color." According to the November 22, 2019 letter, the Company ignored similar questions in 2018 about the Board's lack of African American representation.

76. In January 2019, it was also reported that Oracle worked to block a public

records request seeking the Company's diversity data under the premise that the publication of such data was a "very real threat to its competitive position." The news organization that had asked for the records (Reveal) successfully sued for the records, which showed that Oracle's workforce, as of 2015, was 90 percent white or Asian, and that just under 13 percent of the Company's executives were women.[4]

77. In January 2017, the government sued Oracle for discriminating against Black individuals and minorities. In a press release announcing the lawsuit, the DOL stated:

> **SAN FRANCISCO** — The U.S. Department of Labor has filed a lawsuit against Oracle America, Inc. alleging the leading technology company has a ***systemic practice of paying Caucasian male workers more than their counterparts in the same job title, which led to pay discrimination against female, African American and Asian employees***. The suit also challenges Oracle's systemic practice of favoring Asian workers in its recruiting and hiring practices for product development and other technical roles, which resulted in hiring discrimination against non-Asian applicants.
>
> Oracle designs, manufactures, and sells software and hardware products, as well as offers services related to its products to the federal government.
>
> The lawsuit filed by the department's Office of Federal Contract Compliance Programs is the result of an OFCCP compliance review of Oracle's equal employment opportunity practices at its Redwood Shores headquarters. ***During the investigation – which began in 2014 – Oracle also refused to comply with the agency's routine requests for employment data and records. For example, Oracle refused to provide prior-year compensation data for all employees, complete hiring data for certain business lines, and employee complaints of discrimination. OFCCP attempted for almost a year to resolve Oracle's alleged discrimination violations before filing the suit***.

78. Female employees have also filed class action lawsuits against Oracle, alleging discrimination and disparate pay. On May 1, 2020, a San Mateo Superior Court judge granted class certification to a suit by 4,100 women who allege that Oracle paid

[4] *See* AJ Vicens, *Once Again, Oracle's Diversity Record Comes Under Fire*, MOTHER JONES, Nov. 22, 2019.

them $13,000 less than men.[5] The case against Oracle was filed by former company engineer Sue Petersen and two other women, all of whom worked at PeopleSoft Corp. before it was acquired by Oracle in 2005. They allege that Oracle for years has paid women less than men for "substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions." The plaintiffs emphasized that company-wide compensation is determined at Oracle's headquarters in Redwood Shores, California.

79. Judge Swope, who is presiding over the case, refused to exclude a study, commissioned by the plaintiffs, that found women at Oracle earned 13% less than their male counterparts. The study was done by a UC-Irvine economics professor David Neumark. "Professor Neumark had a reasonable basis for his opinions that education, years of prior job experience, tenure at Oracle, and performance review scores do not explain the gender pay gap faced by women in the same job code as men," the judge wrote.

80. Oracle is still fighting the 2017 lawsuit over gender-pay disparities brought by the DOL. As noted *supra*, the DOL claims that Oracle has not cooperated with the government's investigation and continues to refuse to produce documents and information about its pay practices.

81. As the acrimony between Oracle and the DOL increased due to Oracle's refusal to cooperate, the DOL filed a second complaint against Oracle on January 22, 2019.[6] The agency claims the Company owes women and minorities $400 million in what it says is "the biggest enforcement case" it's ever brought against a federal

---

[5] *See* Bob Egelko, *Judge Allows Suit by 4,100 Women Who Say Oracle Paid Them $13,000 Less Than Men*, SAN FRANCISCO CHRONICLE, May 1, 2020.

[6] In January 2019, the government successfully sought leave from the Administrative Law Judge to file a Second Amended Complaint in the case.

contractor. The government added many new allegations and details in its January 22, 2019 complaint, in which it alleged that Oracle discriminated against African Americans, women, and minorities by paying them less money for the same jobs:

> Oracle's suppression of pay for its non-White, non-male employees is so severe that it persists *and gets worse* over long careers; Black and Asian employees with years of experience are paid as much as 25% less than their peers. Oracle's discriminatory practices affect thousands of employees at its headquarters.[7]

82. The DOL's January 22, 2019 Second Amended Complaint also noted that:

> The few (less than 30) Black or African American employees at Oracle also suffered significant pay discrimination. Those employees were underpaid (relative to White employees) in jobs in Oracle's Product Development job function, resulting in pay disparities as high as 7.5%.[8]

83. The government's complaint also calculated the cost to the minority employees of the discrimination and it was staggering:

> ***Oracle's discrimination against its own employees has cost these employees at least $401,000,000 on lost wages for the period from 2013–2016.***[9]

84. As one newspaper noted in an article commenting on the DOJ complaint, "Oracle robbed just about anyone who wasn't a pasty white male of $400 million."[10]

85. The government alleges that Oracle accomplished the discrimination by using two methods: (a) Oracle relies on prior salaries in setting compensation at Oracle for new hires; and (b) Oracle steers Black individuals, women, and minorities into lower-paying jobs at Oracle.[11]

---

[7] *See* Exhibit A at pp. 1-2.

[8] *Id*. (Motion for Leave to File Second Amended Complaint) at 2.

[9] *Id*.

[10] *See* Richard Chirgwin, *Oracle Robbed Just About Anyone Who Wasn't a Pasty White Male of $400 m, Says Uncle Sam*, THE REGISTER, Feb. 23, 2019.

[11] *See* Exhibit A (DOL's Second Amended Complaint) at 1.

86. The government's January 22, 2019 complaint specifically alleges that Oracle discriminated against Black individuals when recruiting recent college graduates:

> [I]n the four years between 2013 and 2016, Oracle hired only six African American or Black recent college graduates into positions PTI [Professional Technical 1, Individual Contributor] job group, and ***Oracle hired zero Black or African American graduates in 2016***.[12]

87. The Board has had actual knowledge of all these facts at all relevant times. The Congressional letter was sent directly to the Board and Ellison. The Board is intimately familiar with the DOL lawsuit and has authorized the Company's response to the lawsuit. The Board members are all antagonistic to the lawsuit and continue to refuse to correct the violations, instead choosing to back Ellison's nuclear response to the case, characterized by fighting the claims at all costs instead of acknowledging and fixing the problems.

88. Indeed, the Individual Defendants' response to the DOL's lawsuit has gone way beyond merely defending the case and seeking its dismissal. In November 2019, the Defendants went on the offensive and sued the DOL in the United States District Court for the District of Columbia, claiming that the DOL's lawsuit is unconstitutional and violates the Administrative Procedure Act, as well as other federal statutes and regulations. Specifically, Oracle asserts that the DOL "vastly exceeded" its authority by "promulgat[ing] an expansive enforcement regime to prosecute and adjudicate discrimination claims and claims of affirmative action violations against government contractors, and to award compensatory remedies to individual employees and injunctive relief against employers." Claiming to be a victim of the "modern administrative state" created by the DOL, Oracle sought to have the DOL's enforcement regime declared unconstitutional and to make the DOL pay for its attorneys' fees

[12] *Id*. at 3.

associated with the litigation. It is hard to fathom how the DOL lacks the authority to sue for labor law violations, but apparently Oracle believes the best defense is a good offense, regardless of the damage such tactics cause to the Company's reputation and goodwill with its customers. As reported by *Bloomberg*, Oracle's lawsuit against the DOL is believed to "***ha*[*ve*] *no foundation*,**" but reflects Oracle's "***scorched earth*" *litigation tactic***:

> … Some lawyers say that based on decades of precedent, ***Oracle has no foundation for a lawsuit against the Labor Department***. But if a ruling goes in favor of Oracle, it could upend the agency's administrative process — which requires an agency judge and appeals board to rule on OFCCP discrimination claims before an employer can bring the dispute to the federal court system.
>
> "The implications are huge. If Oracle were to win this case, and if it were to be sustained on appeal, OFCCP as we know it would cease to exist," said former Labor Solicitor Patricia Smith, who served during the Obama administration and is now senior counsel at the National Employment Law Project. …
>
> The OFCCP's authority hasn't been challenged in nearly four decades, ***but it would fit Oracle's pattern of what Administrative Law Judge Richard M. Clark described as "scorched earth" litigation***, lawyers said.

Paige Smith, *Oracle Attacks DOL Enforcement Power Ahead of Pay Bias Trial (1)*, BLOOMBERG LAW, Dec. 5, 2019.

**C. False and Misleading Statements Made by the Director Defendants in Oracle's Proxy Statements**

89. Notwithstanding their knowledge about Oracle's failure to promote and achieve diversity and its discriminatory pay practices, the Director Defendants have caused Oracle to consistently make false statements about Oracle's commitment to diversity and the promotion of Blacks and other minority employees to positions of management and power at Oracle. In the 2019 Proxy, signed by Directors Ellison, Berg, Boskin, Catz, Chizen, Conrades, Fairhead, Garcia-Molina, Henley, James, Moorman, Panetta, Parrett, and Seligman, the Directors represented that the Board was qualified in part due to its diversity and efforts to "actively seek[] women and minority candidates from the pool from which director candidates are chosen":

> **Director Qualifications**
>
> Our Corporate Governance Guidelines (described in "Corporate Governance — Corporate Governance Guidelines" on page 18) contain Board membership qualifications that apply to Board nominees recommended by the Governance Committee. The Governance Committee strives for a mix of skills, experience and perspectives that will help create an outstanding, dynamic and effective Board. In selecting nominees, the Governance Committee assesses the independence, character and acumen of candidates and endeavors to collectively establish areas of core competency of the Board, including, among others, industry and technical knowledge and experience; management, accounting and finance expertise; and demonstrated business judgment, leadership and strategic vision. ***The Governance Committee values a diversity of backgrounds, experience, perspectives and leadership in different fields when identifying nominees.*** As noted in our Corporate Governance Guidelines, ***the Governance Committee is committed to actively seeking women and minority candidates for the pool from which director candidates are chosen.***

90. The Proxy also stated:

> **Director Tenure, Board Refreshment and Diversity**
>
> The Board and the Governance Committee value diversity of backgrounds, experience, perspectives and leadership in different fields when identifying nominees. As set forth in our Guidelines, ***the Governance Committee, acting on behalf of the Board, is committed to actively seeking women and minority candidates for the pool from which director candidates are selected***.

91. These statements were false and misleading. In reality, regardless of whether Oracle's Governance Committee (comprised of Defendants Berg, Chizen, and Panetta) ever made any efforts to recruit any Black individuals and other minorities to the Board, no Black individuals currently serve on the Board. Actions speak louder than words. In fact, the Board has never in good faith actively sought minority candidates. The phrase "committed to actively seeking" implies that in fact active, good faith efforts have been made, when in reality Oracle has not actively sought to recruit minorities and has just attempted to create the false impression that it is "committed" to doing so. This is the very definition of a misleading statement.

92. To attempt to justify its failure to break from a status quo rooted in systemic racism, Oracle's Board has resisted efforts to appoint new members to its Board

by claiming that the individuals who have served on the Board for, in some cases decades, have experience that is valuable to the Company. In the Company's 2019 Proxy, the Director Defendants caused Oracle to state:

> However, we do not impose director tenure limits or a mandatory retirement age. The Board has considered the perspectives of some stockholders regarding longer-tenured directors, but believes that longer-serving directors with experience and institutional knowledge bring critical skills to the boardroom. In particular, the Board believes that given the large size of our company, the breadth of our product offerings and the international scope of our organization, longer-tenured directors are a significant strength of the Board. The Board also believes that longer-tenured directors have a better understanding of the challenges Oracle is facing and are more comfortable speaking out and challenging management. ***Accordingly, while director tenure is taken into consideration when making nomination decisions, the Board believes that imposing limits on director tenure would arbitrarily deprive it of the valuable contributions of its most experienced members***.

93. This statement was made with knowledge or reckless disregard of its falsity and with intent to mislead shareholders. In fact, longer-tenured directors do not serve the best interests of the Company, as amply demonstrated by leading academics and professionals in the field of best corporate governance principles. A report by the Harvard Law School Forum on Corporate Governance noted that:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. ***Among the 120 institutional investors*** (***one-third of whom each own or manage assets in excess of $100 billion***) ***who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic***. Just 11 percent of the investor respondents said that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.[13]

94. In reality, the Director Defendants' refusal to adopt director term limits

[13] *Available at* https://corpgov.law.harvard.edu/2017/02/09/board-refreshment-trends-at-sp-1500-firms/ (last visited June 21, 2020).

and to appoint new Black and minority members to the Board represents explicit or implicit racism at Oracle and an improper pretext for failing to add Black and minority individuals to the Board. In misrepresenting the reason for failing to add new members to its Board (by falsely claiming that term limits and new persons added to the Board would deprive Oracle of the "experience" of older white members who have served on the Board for decades), the Director Defendants made intentionally or recklessly false statements in order to get themselves reelected and to conceal the true reasons for Oracle's long-standing failure to add Black individuals to its Board.

95. Elsewhere in the 2019 Proxy Statement, a shareholder advanced the following proposal for the consideration of fellow shareholders:

> ***Resolved***:
>
> Shareholders request Oracle prepare a report by April 2020 (at reasonable cost, omitting proprietary and confidential information), identifying whether a gender pay gap exists among its employees, and if so, outline the steps being taken to reduce the gap. The Organization for Economic Cooperation and Development has defined the gender pay gap as the difference between male and female earnings expressed as a percentage of male earnings.

96. The Director Defendants opposed this resolution. In order to convince shareholders to vote against the resolution, the Director Defendants caused the following false statement to be included in the Proxy:

> **Statement in Opposition to Proposal No. 4**
>
> As a global company with approximately 136,000 employees and customers in over 175 countries, ***we are committed to ensuring that we do not discriminate on the basis of gender in our compensation programs, and we are further committed to diversity and inclusion in our workforce***. We make every effort to attract, invest in and develop the talents of employees who reflect the diversity of our customers and the communities in which we do business. ***We believe a diverse workforce enables us to better anticipate and meet our customers' changing needs in a fast-paced global economy and deliver greater value to our stockholders***.
>
> ***Diversity and inclusion in our workforce starts at the top***. Thirty-three percent of our Board members are women or come from a diverse background (four of our 15 Board members are women, including one of our CEOs). Since 2006, Oracle Women's Leadership (OWL), a leadership and professional development program, has sought to develop, engage

> and empower current and future generations of Oracle women leaders. Each of our more than 80 worldwide OWL communities is led by a senior Oracle woman leader and focuses on professional development, networking and community outreach at the local level. OWL's global events are open to all Oracle employees, promoting diversity and inclusion across our workforce.
>
> ***In addition to fostering diversity and inclusion at Oracle, we support efforts to build a future pipeline of diverse talent in the technology industry globally.***

97. In opposing the shareholder resolution, the Individual Defendants also caused Oracle to include the following false statement in the Proxy:

> Oracle promotes equality through our hiring, pay and promotions processes. Specifically:
>
> - New jobs are posted publicly for anyone to apply.
> - ***Hiring and promotion pay decisions are based on a variety of non-discriminatory factors, including consideration of the job itself and the pay range associated with it, as well as the skills, experience, education and expertise the individual brings to Oracle — not race or gender.***
> - ***Our compensation framework aims to achieve equity, as well as recognition of each employee's particular knowledge, skills, abilities, performance, experience, and contributions to the company.***
> - Inquiries about candidates' prior salary history pay are prohibited. This policy has been in effect in Oracle's U.S. offices prior to the enactment of state laws in California and elsewhere prohibiting this practice.
>
> ***Relatively few global companies have publicized their internal pay data and it does not appear to have had any additional beneficial effect. We believe the creation and publication of a pay equity report as requested by this proposal would be costly and time-consuming and, in light of our long-standing efforts in this area, would not lead to meaningful gains in support of workforce diversity and gender pay equity.***

98. The 2019 Proxy also contained a "Proposal No. 2: ADVISORY VOTE TO APPROVE THE COMPENSATION OF OUR NAMED EXECUTIVE OFFICERS" which stated:

> Pursuant to Section 14A of the Exchange Act, we are asking our stockholders to cast a non-binding, advisory vote on the compensation of our NEOs (a "say-on-pay" vote). We currently hold our say-on-pay vote annually, and we expect the next say-on-pay vote will occur in 2020. In deciding how to vote on this proposal, we urge you to consider the following factors, as well as the information contained in "Executive Compensation—Compensation Discussion and Analysis" beginning on page 28.

## Fiscal 2019 Executive Compensation Highlights

- No tranches of the PSOs granted to Mr. Ellison, Ms. Catz and Mr. Hurd in fiscal 2018 have been earned, due to the rigor and long-term nature of the PSO goals.

- Total compensation for Mr. Ellison, Ms. Catz and Mr. Hurd, in the aggregate, **decreased by approximately 98%** in fiscal 2019 compared to fiscal 2018 (as reported in SCT on page 44). In fiscal 2019, for these NEOs:

  - Base salaries remained unchanged;

  - No bonuses were earned; and

  - No equity awards were granted.

- In the aggregate, approximately **95.2%** of the total compensation reported in the SCT in fiscal 2019 for all other NEOs (Mr. Screven, Ms. Daley and Mr. Henley) was **at-risk.** The total compensation mix for these NEOs is heavily weighted toward equity-based awards, thus aligning their compensation with the interests of our stockholders.

**Fiscal 2019 Compensation**
*Mr. Ellison, Ms. Catz and Mr. Hurd*

Below is an excerpt of our fiscal 2019 SCT showing the total compensation for Mr. Ellison, Ms. Catz and Mr. Hurd. See page 44 for the full SCT and related footnotes.

| Name | Fiscal Year | Salary ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| Lawrence J. Ellison | 2019 | 1 | 1,662,827 | 1,662,828 |
| Safra A. Catz | 2019 | 950,000 | 15,981 | 965,981 |
| Mark V. Hurd | 2019 | 950,000 | 1,531,646 | 2,481,646 |

**Elements of Fiscal 2019 Compensation**
*Mr. Screven, Ms. Daley and Mr. Henley*




### Compensation Best Practices

**✓ Best Practices We Employ**

- ✓ High proportion of compensation for our most senior executives is performance-based and at-risk
- ✓ Caps on maximum payout of bonuses and performance-based equity awards

**✗ Practices We Avoid**

- ✗ No severance benefit arrangements except as provided under our equity incentive plan to employees generally or as required by law
- ✗ No single-trigger change in control vesting of equity awards

| | |
|---|---|
| ✓ Robust stock ownership guidelines<br>✓ Disciplined dilution rates from equity awards<br>✓ Compensation recovery (clawback) policy for cash bonuses in the event of a financial restatement<br>✓ Annual risk assessment of compensation programs<br>✓ Independent compensation consultant and independent compensation committee<br>✓ Anti-hedging policy applicable to all employees and directors | ✗ No change in control acceleration of performance-based cash bonuses<br>✗ No minimum guaranteed vesting for performance-based equity awards<br>✗ No discretionary cash bonuses for CEOs and CTO<br>✗ No tax gross-ups for NEOs<br>✗ No payout or settlement of dividends or dividend equivalents on unvested equity awards<br>✗ No supplemental executive retirement plans, executive pensions or excessive retirement benefits<br>✗ No repricing, cash-out or exchange of "underwater" stock options without stockholder approval |

## Required Vote

We are asking our stockholders to support the compensation of our NEOs and our compensation philosophy as described in this proxy statement. You may vote FOR or AGAINST the following resolution, or you may ABSTAIN. This advisory vote on NEO compensation will be approved if it receives the affirmative vote of the holders of a majority of shares of Oracle common stock present or represented and entitled to vote on this matter at the Annual Meeting.

> "RESOLVED, that the stockholders hereby approve, on an advisory basis, the compensation paid to the named executive officers, as disclosed in Oracle's Proxy Statement for the 2019 Annual Meeting of Stockholders pursuant to the compensation disclosure rules of the U.S. Securities and Exchange Commission, which includes the Compensation Discussion and Analysis, the compensation tables and related narrative disclosures that accompany the compensation tables."

Your vote is advisory, and therefore not binding on Oracle, the Board or the Compensation Committee, and will not be interpreted as overruling a decision by, or creating or implying any additional fiduciary duty for, the Board or the Compensation Committee. Nevertheless, our Board and Compensation Committee value the opinions of our stockholders and view this vote as one of the modes of communication with stockholders. As in prior years, the Board and Compensation Committee will review and consider the outcome of this vote in determining future compensation arrangements for our NEOs.

**The Board of Directors unanimously recommends a vote FOR the advisory approval of the compensation of our NEOs.**

99. This proposal in the Proxy was false and misleading because it failed to disclose that the executives' achievement of performance goals was based in part on unlawful discriminatory hiring and pay practices. The compensation plans gave Defendants a strong incentive to continue concealing the true nature of the Company's discriminatory pay practices in order to boost the Company's reported financial performance and achieve the performance measures such as earnings, financial return ratios, net income, and stock price, for which they could be awarded bonuses.

100. The 2019 Proxy also contained a "Shareholder Proposal 5 – Independent Board Chairman," which asked shareholders to vote in favor of requiring Oracle to replace Ellison as Chairman with an independent director. The proposal stated in part:

> ***It is important to have an Independent Board Chairman because neither the Chairman nor the Lead Director are listening to shareholders***. The co-CEOs of Oracle, Safra Catz and Mark Hurd are at the top of the list of the 100 highest paid CEOs. They both made $108 million each in one year—more than a thousand times greater than the average worker's salary. Meanwhile it has taken 5-years for Oracle stock to crawl from $40 to $50. ***Ironically management previously claimed that it already had the "independent leadership" called for in this proposal.*** Two record $108 million paychecks in one-year does not sound like independent leadership and the shareholders objected to Oracle executive pay. The 2018 say on executive pay vote was almost underwater with only a 53%-vote when many companies obtain a 95%-vote.
>
> George Conrades was lead director and was an overachiever in getting negative votes—39%. Mr. Conrades also chaired the executive pay committee responsible for 2 record $108 million paychecks. Mr. Conrades was in a close downhill race with Naomi Seligman who received 38% in negative votes. The other heavy-hitters in negative votes were Leon Panetta with 31% in negative votes with Jeffrey Berg and Bruce Chizen almost tied with about 23% each in negative votes. And these enormous negative votes were in spite of a possible 100% approval vote from the insider Oracle shareholders.
>
> ***There is plenty of work for an independent Chairman at Oracle. An independent Chairman is more likely to see that Oracle has more independent directors***. Six Oracle directors each had from 18 to 42 years long-tenure. Long-tenure can impair the independence of a director—no matter how well qualified. Independence is a priceless attribute in a director.
>
> ***This proposal topic won 44%-support at a previous Oracle annual meeting. This 44%-support represented majority support from non-insider shares***.

101. In response to this proposal, the Director Defendants caused Oracle to file an opposition position in the Proxy which stated:

> The Board believes it is important to preserve flexibility to determine the most appropriate leadership structure based on an assessment of Oracle's needs and circumstances at any given time. The Board believes our company and our stockholders benefit from this flexibility, as our directors are well positioned to determine our leadership structure given their in-depth knowledge of our leadership team, our strategic goals, and the opportunities and challenges we face. Moreover, our lead independent director role, as well as our other corporate governance practices, already provide the independent leadership and management oversight requested by this proposal.

> As described in our Corporate Governance Guidelines (the Guidelines), the Board does not have a policy mandating the separation of the roles of Chair and CEO. The Board elects our Chair and our CEOs, and these positions may be held by the same person or by different people. Currently, the roles of Chair and CEO are filled by separate individuals. Since September 2014, Mr. Ellison, Oracle's founder and CTO, has served as Chairman, and Ms. Catz and Mr. Hurd have served as CEOs. ***The Board believes that the separation of the offices of the Chair and CEOs is appropriate at this time*** because it allows our CEOs to focus primarily on Oracle's business strategy, operations and corporate vision. ***The Board further believes it is valuable for Mr. Ellison to serve as Chairman because his familiarity with and knowledge of our technologies and product offerings are unmatched. With over 40 years of experience at Oracle, Mr. Ellison is uniquely positioned to help the Board oversee our company's business and strategic direction***.
>
> ***We do not believe that a policy requiring an independent chair is necessary to ensure that the Board provides independent and effective oversight of Oracle's business and management***. Our Guidelines provide that on an annual rotating basis, the chair of the F&A Committee, the Compensation Committee or the Governance Committee serves as the lead independent director at executive sessions of the Board. The lead independent director serves as a liaison between our independent directors and our executive directors and performs additional duties as the Board determines. Currently, Bruce Chizen serves as the lead independent director.

102. These statements were false and misleading because the Director Defendants did not genuinely believe them. Oracle at all times has lacked an independent Chairman, resulting in great harm to Oracle as the Company, controlled by Ellison, engaged in unlawful conduct with respect to discriminatory hiring and pay practices and meritless litigation ordered by Ellison to seek revenge against his perceived enemies. The Individual Defendants actually believed that an independent chairman would help protect Oracle's interests, but agreed to include this opposition statement in the Proxy because it was what Ellison wanted and demanded. The year before, the same proposal had won 44% support from shareholders, including a majority of votes from non-insiders such as Ellison. A statement of support from the Directors would have likely substantially altered the votes at the 2019 Annual Meeting and been material to the voting decisions of shareholders.

103. The false statements had their desired effect. At Oracle's annual meeting in November 2019, all the incumbent white directors were reelected. No competing

Black or minority candidates made it on the ballot. No term limit proposal was adopted. The shareholder proposal that Oracle be required to publish an annual Pay Equity Report was defeated, as was the proposal to replace Ellison as Chairman with an independent Chairman. E&Y was reappointed as the Company's auditor.

104. Oracle published the results of the voting at its annual meeting in a Form 8-K filed on November 22, 2019:

> On November 19, 2019, Oracle Corporation ("Oracle") held its 2019 Annual Meeting of Stockholders (the "Annual Meeting"). Below is a brief description of each matter submitted to a vote at the Annual Meeting, as well as the number of votes cast for and against and the number of abstentions and broker non-votes with respect to each matter. For more information about these proposals, please refer to Oracle's definitive proxy statement filed with the U.S. Securities and Exchange Commission (the "SEC") on September 27, 2019 and the supplement to the proxy statement filed with the SEC on November 8, 2019.
>
> **Proposal No. 1: Election of Directors**
>
> The stockholders elected each of the following persons as a director to hold office until the 2020 Annual Meeting of Stockholders and until his or her successor is elected and qualified, or until his or her earlier resignation or removal.

| Director Nominee | Votes For | Votes Withheld | Broker Non-Votes |
|---|---|---|---|
| Jeffrey S. Berg | 2,092,721,049 | 620,399,516 | 284,909,463 |
| Michael J. Boskin | 2,532,360,712 | 180,759,853 | 284,909,463 |
| Safra A. Catz | 2,659,116,270 | 54,004,295 | 284,909,463 |
| Bruce R. Chizen | 2,085,708,462 | 627,412,103 | 284,909,463 |
| George H. Conrades | 1,948,071,682 | 765,048,883 | 284,909,463 |
| Lawrence J. Ellison | 2,640,162,313 | 72,958,252 | 284,909,463 |
| Rona A. Fairhead | 2,702,414,022 | 10,706,543 | 284,909,463 |
| Jeffrey O. Henley | 2,624,916,140 | 88,204,425 | 284,909,463 |
| Renée J. James | 2,638,446,569 | 74,673,996 | 284,909,463 |
| Charles W. Moorman IV | 2,024,942,088 | 688,178,477 | 284,909,463 |
| Leon E. Panetta | 1,963,328,155 | 749,792,410 | 284,909,463 |
| William G. Parrett | 2,684,906,371 | 28,214,194 | 284,909,463 |
| Naomi O. Seligman | 1,979,012,304 | 734,108,261 | 284,909,463 |

> **Proposal No. 2: Advisory Vote to Approve the Compensation of Oracle's Named Executive Officers**
> The stockholders cast an advisory vote approving the compensation of Oracle's named executive officers as follows: 1,562,280,318 shares in favor, 1,146,505,043 shares against, 4,335,204 shares abstaining and 284,909,463 broker non-votes.

**Proposal No. 3: Ratification of Selection of Independent Registered Public Accounting Firm**
The stockholders ratified the appointment of Ernst & Young LLP as Oracle's independent registered public accounting firm for the fiscal year ending May 31, 2020, with 2,960,045,696 shares in favor, 35,127,374 shares against and 2,856,958 shares abstaining.

**Proposal No. 4: Stockholder Proposal Regarding Pay Equity Report**
The stockholders did not approve a stockholder proposal requesting that Oracle prepare a gender pay equity report, with 942,828,312 shares in favor, 1,699,773,596 shares against, 70,518,657 shares abstaining and 284,909,463 broker non-votes.

**Proposal No. 5: Stockholder Proposal Regarding Independent Board Chair**
The stockholders did not approve a stockholder proposal requesting that Oracle's Board of Directors (the "Board") adopt a policy requiring the Chair of the Board, whenever possible, to be an independent member of the Board, with 953,662,512 shares in favor, 1,755,172,042 shares against, 4,286,011 shares abstaining and 284,909,463 broker non-votes.

105. The 2019 Proxy was materially misleading because it failed to disclose:

(a) That the statement "Hiring and promotion pay decisions are based on a variety of non-discriminatory factors, including consideration of the job itself and the pay range associated with it, as well as the skills, experience, education and expertise the individual brings to Oracle—not race or gender" was not accurate, since the Company's decisions do take into consideration race even if the other stated factors are also considered;

(b) That the Company's opposition to term limits is not due to a desire to retain the "experience" of the incumbent Director Defendants, but instead to keep minorities off the Board;

(c) That the Company's stated reason for not publishing an annual diversity and/or pay report was false, and was not due to the asserted cost of preparing and publishing such report; and instead, that the real reason for the Company's refusal to disclose its salary and pay/employment data in an annual report is due to a desire to conceal existing, known, and glaring pay disparity at the Company;

(d) That the Company's stated policies with respect to diversity and

anti-discrimination were not effective and were not being complied with;

(e) That the Board's Governance Committee did not take diversity into consideration when evaluating potential Board candidates, and instead simply claimed to do so in order to create a false appearance of compliance with the law;

(f) that the Director Defendants did not genuinely believe the statement in the Proxy that it was not in the Company's best interests, or necessary, to have an independent Chairman since the current governance structure was working effectively; in fact, as demonstrated herein and below, the Individual Defendants all knew that Oracle's best interests were not being adequately protected by Ellison serving as Chairman, as amply demonstrated by the Department of Labor lawsuit alleging systematic hiring and pay discrimination and HP's $3.0 billion verdict against Oracle due to Ellison's improper personal vendetta against HP;

(g) Defendants' knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access, and that rampant unlawful discrimination exists at the Company;

(h) Defendants' knowledge, learned from Congressional letters to Ellison and the Board, that the Company's repeated failure to promote diversity was among the worst of all publicly-traded companies;

(i) The Defendants' knowledge of continuing and repeated violations of federal contracting policies and laws due to discriminatory pay practices that adversely affected minorities and women;

(j) That the Company was preferring the hiring of Asian Indians over other minorities and women;

(k) That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to diversity and anti-discrimination were being complied with;

(l) That Defendants failed to appropriately address the Company's lack of diversity and discriminatory practices towards minorities in hiring and promotion and misleading claims regarding the same; and

(m) That, as a result, the Company was at substantial risk of large monetary fines, penalties, and adverse judgments in pending lawsuits due to the fact that the Company was not in compliance with federal and state laws regarding hiring, promotion, and pay practices.

106. The 2019 Proxy harmed the Company by interfering with the proper governance on its behalf that requires stockholders' informed voting of directors. As a result of the false or misleading statements in the 2019 Proxy, stockholders voted to re-elect all of the Defendants to the Board and voted against requiring Oracle to have an independent Chairman.

107. The statements in the 2019 Proxy conveyed that the Company's corporate governance structure was "effective" and provided "oversight of management and Board accountability." In reality, the Company's corporate governance structure and defective internal controls allowed senior executives and the Board to sidestep real accountability and instead continue perpetuating the discriminatory practices that led to the DOL lawsuit and the Company's discriminatory pay practices, private class action lawsuits filed by female employees, Congressional inquiry into the lack of diversity at Oracle, and other discrimination in hiring practices and lack of diversity on both the Board and management.

108. The 2019 Proxy, which contained materially misleading statements and thus deprived shareholders of adequate information necessary to make a reasonably informed decision, caused the Company's stockholders to reelect all of the Defendants to the Board while they were breaching their fiduciary duties to the Company and deliberately concealing material information concerning the Company's discrimination against Black individuals and other minorities and its effects on the Company's business

and reputation.

109. The Company and its shareholders were harmed by the approval of incentive compensation awards to certain of the Individual Defendants, such as executive officers, such as Catz, Ellison, and others, who helped perpetrate the illegal discriminatory hiring and compensation practices. Had shareholders known of the underlying misconduct at the Company, they would not have voted to keep the same Directors who were allowing the illegal practices to continue. Even if the alleged fraudulent discriminatory practices began before the Proxy Statements issued, they continued after the Proxy Statements issued because Board members elected by shareholders pursuant to the Proxy Statements allowed the practice to continue.

110. **2018 PROXY** — The statements above that the Director Defendants caused the Company to make in the 2019 Proxy were substantially identical to statements they had caused Oracle to include in the 2018 Proxy, which was filed by Oracle with the SEC on September 26, 2018. The 2018 Proxy contained a shareholder proposal asking that Oracle be required to have an independent Chairman that was substantially identical to the same proposal in the 2019 Proxy.

111. The 2018 Proxy was approved by the Directors below, and the table below identifies committee membership as of September 17, 2018, the record date of the 2018 Annual Meeting:

| Director | Finance and Audit | Compensation | Governance | Independence |
|---|---|---|---|---|
| Jeffrey S. Berg | ✓ | | ✓ | ✓ Chair |
| Michael J. Boskin | ✓ Chair | | | |
| Safra A. Catz | | | | |
| Bruce R. Chizen | ✓ | | ✓ Chair | |
| George H. Conrades | | ✓ Chair | | ✓ |
| Lawrence J. Ellison | | | | |
| Hector Garcia-Molina | | | | ✓ |
| Jeffrey O. Henley | | | | |
| Mark V. Hurd | | | | |
| Renée J. James | | | | |
| Charles W. Moorman IV | | ✓ | | |
| Leon E. Panetta | | ✓ | ✓ | |
| William G. Parrett | ✓ | | | |
| Naomi O. Seligman | | ✓ Vice Chair | | |

112. For example, similar to the language in the 2019 Proxy, the 2018 Proxy stated the following:

> As noted in our Corporate Governance Guidelines, the Governance Committee is committed to actively seeking women and minority candidates for the pool from which director candidates are chosen.[14]

113. The 2018 Proxy also stated:

> The Board and the Governance Committee value diversity of backgrounds, experience, perspectives and leadership in different fields when identifying nominees. As noted in our Corporate Governance Guidelines, the Governance Committee, acting on behalf of the Board, is committed to actively seeking women and minority candidates for the pool from which director candidates are chosen.

114. The 2018 Proxy also stated that Oracle opposes term limits:

> [W]e do not impose director tenure limits or a mandatory retirement age. The Board has considered the concerns raised by some stockholders regarding longer-tenured directors, but believes that longer-serving directors with experience and institutional knowledge bring critical skills to the boardroom. In particular, the Board believes that given the large size of our company, the breadth of our product offerings and the international scope of our organization, longer-tenured directors are a significant strength of the Board. The Board also believes that longer-tenured directors have a better understanding of the challenges Oracle is facing and are more comfortable speaking out and challenging management. Accordingly, while director tenure is taken into consideration when making nomination decisions, the Board believes that imposing limits on director tenure would arbitrarily deprive it of the valuable contributions of its most experienced members.

115. The 2018 Proxy also contained a statement approved by the Director Defendants in opposition to the shareholder proposal regarding an independent chairman:

> ***We do not believe that a policy requiring an independent chair is necessary to ensure that the Board provides independent and effective oversight of Oracle's business and management.*** Our Guidelines provide that on an annual rotating basis, the chair of the F&A Committee, the Compensation Committee or the Governance Committee serves as the lead independent

---

[14] *See* Oracle's 2018 Proxy at 6.

> director at executive sessions of the Board. The lead independent director serves as a liaison between our independent directors and our executive directors and performs additional duties as the Board determines. Currently, George Conrades serves as the lead independent director and has served on the Board for 10 years, since 2008.
>
> ***As required by our Guidelines, a majority of the Board and each member of the F&A Committee, the Compensation Committee, the Governance Committee and the Independence Committee are "independent" under the applicable NYSE and SEC rules, which ensures that oversight of critical matters—such as the integrity of Oracle's financial statements, the compensation of our executive officers, the selection and evaluation of directors, and the development of corporate governance principles—is entrusted to independent directors***. The Board and each of its committees have unrestricted access to officers and employees of Oracle and have the authority to ask such questions and conduct investigations, and to retain legal, accounting, financial or other outside advisors, as they deem necessary or appropriate to fulfill their duties. In addition, as required by our Guidelines, our non-employee directors meet in executive sessions without management on a regular basis. If the non-employee directors include any director who is not an independent director, at least once each year the independent directors will meet in executive session.

116. The 2018 Proxy also contained a proposal submitted by the Director Defendants asking shareholders to approved executive compensation at the Company:

> Pursuant to Section 14A of the Exchange Act, we are asking our stockholders to cast a non-binding, advisory vote on the compensation of our NEOs (a "say-on-pay" vote). We currently hold our say-on-pay vote annually, and we expect the next say-on-pay vote will occur in 2019. In deciding how to vote on this proposal, we urge you to consider the following factors, as well as the information contained in "Executive Compensation—Compensation Discussion and Analysis" beginning on page 26.
>
> **Significant Fiscal 2018 Compensation Changes in Response to Stockholder Feedback**

In fiscal 2018, after considering stockholder feedback and the input of its independent compensation consultant, the Compensation Committee granted each of Mr. Ellison, Ms. Catz, Mr. Hurd and Mr. Kurian an equity award consisting entirely of **PSOs** that may be earned only upon the attainment of rigorous stock price, market capitalization and operational performance goals over a **five-year performance period**.

**Compensation Committee Responsiveness**

The Compensation Committee believes the fiscal 2018 PSO awards are responsive to a number of stockholder concerns, as described below.

| What We Heard | The Compensation Committee's Response |
|---|---|
| NEO equity awards should not vest based solely on the passage of time | *100% Performance-Based Equity Compensation Granted.* In fiscal 2018, Mr. Ellison, Ms. Catz, Mr. Hurd and Mr. Kurian each received an equity award consisting entirely of PSOs that may be earned only upon the attainment of rigorous stock price, market capitalization and operational performance goals over a five-year performance period. |
| Performance metrics should better align with stockholder value | *New Rigorous Performance Goals.* Six of the seven PSO tranches may be earned only if Oracle satisfies a combination of (1) an operational performance goal tied to significant growth of Oracle's cloud business and (2) a substantial increase in Oracle's market capitalization. The seventh PSO tranche may be earned only upon significant growth in Oracle's stock price. None of the goals were satisfied in fiscal 2018, and thus no portion of the PSOs have been earned to date. |
| NEO compensation should be reduced | *Significant Decrease in Equity Compensation Value.* The PSOs will result in a decrease in equity compensation value for the grantees. When the grant date fair value of the PSOs is annualized over the five-year performance period, it represents a 47% decrease from the value of the fiscal 2017 equity awards granted to each of Mr. Ellison, Ms. Catz and Mr. Hurd and a 59% decrease from the value of the fiscal 2017 equity awards granted to Mr. Kurian. |
| Long-term equity awards should have a minimum three-year performance period | *Five-Year Performance Period.* The PSOs may be earned over a five-year performance period. The PSOs were granted with the expectation that no additional equity awards will be granted to Mr. Ellison, Ms. Catz, Mr. Hurd and Mr. Kurian until 2022 at the earliest. |

## Emphasis on Performance-Based Compensation

**Elements of Fiscal 2018 Compensation**
*Mr. Ellison, Ms. Catz, Mr. Hurd and Mr. Kurian*




In fiscal 2018, an average of **98.9%** of the total compensation (as reported in the Summary Compensation Table on page 42) of Mr. Ellison, Ms. Catz, Mr. Hurd and Mr. Kurian was **performance-based.**

See pages 31 to 35 for details regarding the elements of our NEOs' compensation in fiscal 2018.

## Compensation Best Practices

### ✓ Best Practices We Employ

- ✓ High proportion of NEO compensation is performance-based and at-risk
- ✓ Annual risk assessment of compensation programs
- ✓ Caps on maximum payout of bonuses and performance-based equity awards

### ✗ Practices We Avoid

- ✗ No severance benefit plans or agreements except as provided under our equity incentive plan to employees generally or as required by law
- ✗ No single-trigger change in control vesting of equity awards
- ✗ No change in control acceleration of performance-based cash bonuses
- ✗ No minimum guaranteed vesting for performance-based equity awards

| | |
|---|---|
| ✓ Independent compensation consultant and independent compensation committee | ✗ No discretionary cash bonuses for NEOs |
| ✓ Compensation recovery (clawback) policy for cash bonuses in the event of a financial restatement | ✗ No tax gross-ups for NEOs |
| ✓ Modest dilution rates from equity awards | ✗ No payout or settlement of dividends and dividend equivalents on unvested equity awards |
| ✓ Robust stock ownership guidelines | ✗ No supplemental executive retirement plans, executive pensions or excessive retirement benefits |
| | ✗ No repricing, cash-out or exchange of "underwater" stock options without stockholder approval |

117. These statements in the 2018 Proxy were false and misleading for the same reasons alleged above with respect to the false statements in the 2019 Proxy. Similar to the 2019 Proxy, the 2018 Proxy contained shareholder proposals for an independent chairman of the Board and for a Pay Equity Report. Similar to 2019, in 2018 the Director Defendants caused Oracle to oppose those proposals with language that was substantially identical to the language quoted *supra* from the 2019 Proxy. Both such proposals were defeated in 2018, too.

118. On November 16, 2018, Oracle filed a Form 8-K disclosing the results of the voting at the 2018 annual meeting. The Form 8-K stated:

> On November 14, 2018, Oracle Corporation ("Oracle") held its 2018 Annual Meeting of Stockholders (the "Annual Meeting"). Below is a brief description of each matter submitted to a vote at the Annual Meeting, as well as the number of votes cast for and against and the number of abstentions and broker non-votes with respect to each matter. For more information about these proposals, please refer to Oracle's definitive proxy statement filed with the U.S. Securities and Exchange Commission on September 26, 2018.
>
> **Proposal No. 1: Election of Directors**
> The stockholders elected each of the following persons as a director to hold office until the 2019 Annual Meeting of Stockholders and until his or her successor is elected and qualified, or until his or her earlier resignation or removal.

| Director Nominee | Votes For | Votes Withheld | Broker Non-Votes |
|---|---|---|---|
| Jeffrey S. Berg | 2,286,090,806 | 713,920,998 | 364,363,453 |
| Michael J. Boskin | 2,793,472,989 | 206,538,815 | 364,363,453 |
| Safra A. Catz | 2,918,660,564 | 81,351,240 | 364,363,453 |
| Bruce R. Chizen | 2,292,055,506 | 707,956,298 | 364,363,453 |

| | | | |
|---|---|---|---|
| George H. Conrades | 1,828,120,062 | 1,171,891,742 | 364,363,453 |
| Lawrence J. Ellison | 2,888,704,306 | 111,307,498 | 364,363,453 |
| Hector Garcia-Molina | 2,907,452,946 | 92,558,858 | 364,363,453 |
| Jeffrey O. Henley | 2,895,131,049 | 104,880,755 | 364,363,453 |
| Mark V. Hurd | 2,918,363,733 | 81,648,071 | 364,363,453 |
| Renée J. James | 2,882,817,741 | 117,194,063 | 364,363,453 |
| Charles W. Moorman IV | 2,960,620,549 | 39,391,255 | 364,363,453 |
| Leon E. Panetta | 2,063,787,934 | 936,223,870 | 364,363,453 |
| William G. Parrett | 2,947,450,952 | 52,560,852 | 364,363,453 |
| Naomi O. Seligman | 1,857,247,097 | 1,142,764,707 | 364,363,453 |

**Proposal No. 2: Advisory Vote to Approve the Compensation of Oracle's Named Executive Officers**
The stockholders cast an advisory vote approving the compensation of Oracle's named executive officers as follows: 1,615,328,515 shares in favor, 1,380,374,165 shares against, 4,309,124 shares abstaining and 364,363,453 broker non-votes.

**Proposal No. 3: Ratification of Selection of Independent Registered Public Accounting Firm**
The stockholders ratified the appointment of Ernst & Young LLP as Oracle's independent registered public accounting firm for the fiscal year ending May 31, 2019, with 3,312,743,519 shares in favor, 48,285,585 shares against and 3,346,153 shares abstaining.

**Proposal No. 4: Stockholder Proposal Regarding Pay Equity Report**
The stockholders did not approve a stockholder proposal requesting that Oracle prepare a gender pay equity report, with 1,160,740,836 shares in favor, 1,822,556,197 shares against, 16,714,771 shares abstaining and 364,363,453 broker non-votes.

**Proposal No. 5: Stockholder Proposal Regarding Political Contributions Report**
The stockholders did not approve a stockholder proposal requesting that Oracle provide a semiannual political contributions report, with 627,790,135 shares in favor, 2,322,404,657 shares against, 49,817,012 shares abstaining and 364,363,453 broker non-votes.

**Proposal No. 6: Stockholder Proposal Regarding Lobbying Report**
The stockholders did not approve a stockholder proposal requesting that Oracle prepare an annual lobbying report, with 812,220,027 shares in favor, 2,071,665,030 shares against, 116,126,747 shares abstaining and 364,363,453 broker non-votes.

**Proposal No. 7: Stockholder Proposal Regarding Independent Board Chair**
The stockholders did not approve a stockholder proposal requesting that Oracle's Board of Directors (the "Board") adopt a policy requiring the Chair of the Board, whenever possible, to be an independent member of the Board, with 921,983,557 shares in favor, 2,074,007,468 shares against, 5,020,779 shares abstaining and 364,363,453 broker non-votes.

### D. Oracle's Nominating and Corporate Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board

119. The Charter of the Nominating and Governance Committee states the following with respect to the duties of the Board members serving on such committee:

> **RESPONSIBILITIES AND DUTIES**
>
> In furtherance of its purpose, the Committee shall have the following responsibilities and duties:
>
> - As appropriate, ***actively seek, interview, evaluate and nominate individuals qualified to become board members*** and recommend such nominees to the Board for endorsement in accordance with the Corporate Governance Guidelines.
> - Periodically review and reassess the adequacy of the Corporation's corporate governance policies and procedures and recommend any proposed changes to the Board.
> - Periodically review and reassess the adequacy of the Corporation's policies, plans and procedures with respect to succession planning, including policies and principles for CEO selection and performance review, as well as policies regarding succession in the ordinary course of business and in the event of unexpected events or emergencies. The Committee shall recommend any proposed changes to the Board.
> - Hire legal, accounting, financial or other advisors as the Committee may deem necessary in its best judgment with due regard to cost, without the need to obtain the prior approval of any officer of the Corporation. The secretary of the Corporation will arrange for payment of the invoices of any such party.
> - In the sole authority of the Committee, retain and terminate any search firm to be used to identify director candidates. The Committee shall have sole authority to approve the search firm's fees and other retention terms.
> - ***On an annual basis, review and assess the performance of the Board and its committees and report such assessment, including any recommendations for proposed changes, to the Board***. The Committee should seek comments from each of the directors or committee members, as the case may be, with respect to such assessment.
> - Form, and delegate authority to, subcommittees when appropriate.
> - Make periodic reports to the Board.
> - Periodically review and reassess the adequacy of this Charter and recommend any proposed changes to the Board.

120. The 2019 Proxy also stated the following with respect to the Nominating

and Governance Committee responsibilities:

> ***The Governance Committee has responsibility for monitoring corporate governance matters, including periodically reviewing the composition and performance of the Board and its committees*** (including reviewing the performance of individual directors), reviewing and assessing the adequacy of our policies, plans and procedures regarding succession planning, and overseeing our Corporate Governance Guidelines. ***The Governance Committee also considers and recommends qualified candidates for election to the Board***.

121. The members of the Committee (Panetta, Chizen and Berg) have breached their fiduciary duties as directors by failing to fulfill these duties. Rather than causing Oracle to comply with the principles it claims to follow with respect to its corporate governance, Panetta, Chizen and Berg have caused Oracle to merely pay lip service to these principles. Instead of recommending well-qualified Black and minority candidates to serve on Oracle's Board, Panetta, Chizen and Berg have perpetuated the all-white Board under the pretext that the existing members' "experience" and long tenure on the Board is beneficial to Oracle.

122. Moreover, to entrench themselves and their fellow directors in office, all the Director Defendants have opposed term limits in order to prevent the addition of qualified Black and minority candidates to the Board.

123. As the saying goes, the rich get richer while the poor get poorer. Serving on Oracle's Board has enriched the already-rich elites whose profitable sinecure has been perpetuated by the Defendants' wrongdoing. Many qualified Black and minority candidates would benefit greatly from the prestige and compensation that comes with a position on Oracle's Board. The following chart sets forth the compensation earned by outside directors on Oracle's Board in 2019:

> ***Fiscal 2019 Director Compensation Table***
>
> The following table provides summary information regarding the compensation we paid to our non-employee directors in fiscal 2019.

| Name (1) | Fees Earned or Paid in Cash ($) | Stock Awards (2) (3) ($) | Total ($) |
|---|---|---|---|
| Jeffrey S. Berg | 122,500 | 456,326 | 578,826 |
| Michael J. Boskin | 102,500 | 588,819 | 691,319 |
| Bruce R. Chizen | 107,500 | 456,326 | 563,826 |
| Georg Conrades | 117,500 | 588,819 | 706,319 |
| Hector Garcia-Molina | 67,500 | 392,562 | 460,062 |
| Renée J. James | 52,500 | 392,562 | 445,062 |
| Charles W. Moorman IV | 73,288 | 392,562 | 465,850 |
| Leon E. Panetta | 92,500 | 392,562 | 485,062 |
| William G. Parrett | 73,288 | 392,562 | 465,850 |
| Naomi O. Seligman | 77,500 | 392,562 | 470,062 |

### E. The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination

124. The Director Defendants have known for years that Oracle has been violating federal and state laws regarding diversity, equal pay, and discrimination against minorities.

125. Defendants' knowledge is reflected by the fact that, as recently as 2017, Oracle was still trying to hide the facts and statistics about its lack of workforce diversity, arguing the demographic data was a trade secret. Oracle was one of the few

companies in Silicon Valley doing so; another company which tried to hide the information was Palantir.[15]

126. In addition to improperly claiming that the diversity statistics were trade secrets, Oracle refused to publish annual diversity reports, thus enabling the Company to attempt to hide the lack of diversity. The Director Defendants were aware of this and were complicit in these acts, thus demonstrating their scienter about Oracle's failure to ensure diversity and failure to pay minorities equal pay.

127. Oracle's deafening silence at the time that many corporations are openly expressing outrage at the murders of George Floyd, Breonna Taylor, and Ahmaud Arbery, among others, reflects the misleading nature of Oracle's professed commitment to diversity in its proxy statements.

128. Now, more than ever, corporations are recognizing that silence equates to complicity in the fight against systemic racism. Over the last month, in response to the public indignation over these murders, dozens of corporations have publicly condemned racism and showed solidarity for Black Lives Matter, pledging to donate millions of dollars to anti-discrimination efforts and programs to support Black businesses.[16]

---

[15] *See* Natasha Tiku, *Oracle Allegedly Underpaid Women and Minorities by $400 Million. Now the Details Are Set to Come out in Court*, THE WASHINGTON POST, Dec. 5, 2019.

[16] David Hessekiel, "*Companies Taking a Public Stand in the Wake of George Floyd's Death*," FORBES (June 4, 2020), at https://www.forbes.com/sites/davidhessekiel/2020/06/04/companies-taking-a-public-stand-in-the-wake-of-george-floyds-death/#1a8f9b8e7214; Tiffany Hsu, "*Corporate Voices Get Behind 'Black Lives Matter' Cause*," NEW YORK TIMES (May 31, 2020), at https://www.nytimes.com/2020/05/31/business/media/companies-marketing-black-lives-matter-george-floyd.html; Rachael Myrow, "*Silicon Valley's Black Employees Question Corporate Claims That Black Lives Matter*," KQED (June 18, 2020), at https://www.kqed.org/news/11824857/silicon-valleys-black-employees-question-corporate-claims-that-black-lives-matter; David Gelles, "*Corporate America Has Failed Black America*," NEW YORK TIMES (June 6, 2020), at https://www.nytimes.com/2020/06/06/business/corporate-america-has-failed-black-america.html?referringSource=articleShare.

129. Although many of these companies stood on the sidelines for much too long and were silent in the wake of the deaths of Eric Garner and Michael Brown,[17] this recent corporate outpouring is a meaningful first step that could lead to serious and significant changes in how corporations combat systemic racism within their own workforces.

130. Indeed, while many companies have only made public statements or pledged to donate money to anti-racist causes, other companies and corporate executives are looking inward and taking more meaningful measures to address racial discrimination in hiring and promotion. For example:

a. Microsoft, Intel, and Johnson & Johnson have pledged to tie executive pay to diversity metrics.[18]

b. PepsiCo announced a five-year, $400 million initiative that includes the goal of increasing Black managerial representation by 30% and more than doubling business with Black-owned suppliers.[19]

c. Adidas committed to filling 30% of new positions with Black or Latino workers.[20]

---

[17] Jay Peters, "*Big Tech Companies Are Responding to George Floyd in a Way They Never Did for Michael Brown,*" THE VERGE (June 12, 2020), at https://www.theverge.com/2020/6/5/21281017/amazon-apple-facebook-response-george-floyd-michael-brown-tech-companies-google.

[18] David Gelles, "*Corporate America Has Failed Black America,*" NEW YORK TIMES (June 6, 2020), at https://www.nytimes.com/2020/06/06/business/corporate-america-has-failed-black-america.html?referringSource=articleShare.

[19] Ramon Laguarta, "*PepsiCo CEO: 'Black Lives Matter, to our company and me.' What the food and beverage giant will do next,*" FORTUNE (June 16, 2020), at https://fortune.com/2020/06/16/pepsi-ceo-ramon-laguarta-black-lives-matter-diversity-and-inclusion-systemic-racism-in-business/?utm_source=email&utm_medium=newsletter&utm_campaign=ceo-daily&utm_content=2020061711am.

[20] *Message from the Adidas Board: Creating Lasting Change Now* (June 9, 2020), at https://www.adidas-group.com/en/media/news-archive/press-releases/2020/message-adidas-board-creating-lasting-change-now/.

d. Alexis Ohanian, the co-founder of Reddit, resigned from Reddit's all-white board, urged the board to fill his seat with a Black candidate, and pledged to use future gains on his Reddit stock to serve the Black community, starting with Colin Kaepernick's Know Your Rights Camp.[21]

131. In stark contrast, Oracle has remained conspicuously silent in the wake of George Floyd's murder despite the dramatic show of solidarity from other corporations.[22] Oracle's silence may be deafening, but it is sadly not surprising.

### F. The Board Has Breached Its Duties by Failing to Ensure an Independent Chairman

132. There is no independent Chairman of the Board at Oracle. Larry Ellison fills that role. Oracle purports to assign some significance to the fact that the roles of Chairman and CEO are separated. But the CEO, Catz, was hand-groomed by Ellison while he was still CEO. Ellison, as Chairman, is not independent even though he is not the CEO anymore.

133. Simply put, the Director Defendants had a fiduciary duty to ensure that the Chairman of the Board was independent. They have completely failed to do so, and their failure to do so has been a huge part of the problem, allowing the lack of diversity to continue at Oracle, both among the management ranks and on the Board itself. As demonstrated below, the lack of an independent Chairman at Oracle has also resulted in massive liability of $4.0 billion and counting. The Director Defendants' failure to insist upon an independent Chairman at Oracle allowed Ellison to pursue a meritless personal

---

[21] Megan Rose Dickey, *"Unpacking Tech's Response to the Killing of George Floyd,"* TECHCRUNCH (June 9, 2020), at https://techcrunch.com/2020/06/09/unpacking-techs-response-to-george-floyds-death/.

[22] Ed Targett, "Here's How Big Tech's CEOs Have Reacted to America's Raging Protests," COMPUTER BUSINESS REVIEW (June 2, 2020), at https://www.cbronline.com/list/big-tech-ceos-george-floyd.

vendetta against HP, pursuant to which Oracle breached the clear terms of a settlement agreement with HP, causing HP billions in damages and a resulting judgment against Oracle that Oracle has not paid and has not taken a reserve for in its financial statements, thus creating its financial statements to present a false and misleading picture of its financial condition.

### G. The Director Defendants Have Breached Their Duties by Continually Rehiring Ernst & Young as the Company's Auditor

134. Ernst & Young is the Company's auditor, and has been so since 2002 – eighteen years and counting.

135. As Oracle's Proxy Statement from 2019 disclosed, the following table sets forth the approximate aggregate fees billed to Oracle by E&Y for fiscal 2019 and fiscal 2018:

| | **2019** | **2018** |
|---|---|---|
| Audit Fees (1) | 26,520,352 | 26,682,575 |
| Audit Related Fees (2) | 2,115,207 | 2,545,802 |
| Tax Fees (3) | 3,810,118 | 2,293,818 |
| All Other Fees | 0 | 0 |
| **Total Fees** | **$32,445,677** | **$31,522,195** |

136. Despite billing Oracle over $31 million in fees in both 2018 and 2019, E&Y has completely failed to properly audit and assess the Company's internal controls.

137. Defendants Boskin (Chair), Chizen, Berg and Parrett, as the members of Oracle's Audit & Finance Committee, are responsible for selecting and monitoring Ernst

& Young. The Company's 2019 Proxy states:

> EY has served as our independent registered public accounting firm since 2002. In conjunction with the mandated rotation of EY's lead engagement partner, the F&A Committee is involved in the selection of EY's lead engagement partner. The F&A Committee also periodically
>
> considers whether there should be a rotation of independent registered public accounting firms because the F&A Committee believes that it is important for the registered public accounting firm to maintain independence and objectivity. In deciding to engage EY, our F&A Committee reviewed, among other factors, registered public accounting firm independence issues raised by commercial relationships we have with the other major accounting firms.

138. The 2019 Proxy Statement also represented that:

> The F&A Committee reviews audit and non-audit services performed by EY, as well as the fees charged by EY for such services. In its review of non-audit service fees, the F&A Committee considers, among other things, the possible effect of the performance of such services on the registered public accounting firm's independence.

139. Defendants Boskin (Chair), Chizen, Berg and Parrett, as the members of Oracle's Audit & Finance Committee, also prepared and included a report in the 2019 Proxy as follows:

> **REPORT OF THE FINANCE AND AUDIT COMMITTEE OF THE BOARD OF DIRECTORS**
>
> Review of Oracle's Audited Financial Statements for the Fiscal Year Ended May 31, 2019
>
> The F&A Committee has reviewed and discussed with our management our audited consolidated financial statements for the fiscal year ended May 31, 2019.
>
> The F&A Committee has discussed with Ernst & Young LLP, our independent registered public accounting firm, the matters required to be discussed by Auditing Standard No. 1301, "Communications with Audit Committees" issued by the Public Company Accounting Oversight Board (PCAOB).
>
> The F&A Committee has also received the written disclosures and the letter from Ernst & Young LLP required by applicable requirements of the PCAOB regarding Ernst & Young LLP's communications with the F&A Committee concerning independence and the F&A Committee has discussed the independence of Ernst & Young LLP with that firm.
>
> Based on the F&A Committee's review and discussions noted above, the F&A Committee recommended to the Board of Directors that our audited

> consolidated financial statements be included in our Annual Report on Form 10-K, for the fiscal year ended May 31, 2019, for filing with the U.S. Securities and Exchange Commission.
>
> Submitted by: Michael J. Boskin, Chair
> Bruce R. Chizen
> Jeffrey S. Berg
> William G. Parrett

140. E&Y has served as Oracle's auditor ***since 2002***, giving rise to a cozy and clubby relationship between E&Y and Oracles which is not conducive to effective auditing. The Company's compliance with its stated policies concerning the alleged commitment to diversity has been abysmal to the point of being basically non-existent.

141. The very purpose of an auditor is to assess the Company's internal controls and determining if they are functioning effectively. Rather than doing so, E&Y has wrongfully and consistently given Oracle's internal controls a clean bill of health and has failed to point out the obvious – that Oracle lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

142. Defendants Boskin, Chizen, Berg, and Parrett, as the members of the Finance and Audit Committee, breached their fiduciary duties by failing to perform their duties on the Finance & Audit Committee, including failure to ensure that an adequate audit was being performed of the Company's internal controls regarding diversity, anti-discrimination, anti-harassment, pay equity, and other relevant areas of critical importance to the Company. They also signed the 2019 Proxy Statement that contained false statements regarding the Company's internal controls being effective and adequate, which were false and gave a very misleading and inaccurate portrayal of these key issues to stockholders.

///

### H. The Individual Defendants Breached Their Duties of Loyalty and Good Faith by Causing Oracle to Intentionally Breach Its Obligations Under a Settlement Agreement Related to the Departure of Mark Hurd from Hewlett Packard, Resulting in a Massive $3.0 Billion Judgment Against the Company

143. Defendant Ellison openly admits that former Co-CEO Mark Hurd was a close personal friend of his. When Hurd recently passed away in October 2019, Ellison sent the following note to all Oracle employees:

> It is with a profound sense of sadness and loss that I tell everyone here at Oracle that Mark Hurd passed away early this morning. Mark was my close and irreplaceable friend, and trusted colleague. Many of us are inconsolable right now, but we are left with memories and a sense of gratitude…that we had the opportunity to get know Mark, the opportunity to work with him…and become his friend.

144. Hurd was a long-time close personal friend of Ellison's, going back way before Hurd joined Oracle.

145. Prior to joining Oracle at Ellison's invitation, Hurd had a very public and very embarrassing fall from grace at HP, where he was fired in 2010 from his job as Chairman and CEO of HP. Hurd, who was married at the time, had an improper personal affair with adult female movie actress Jodie Fisher, who had been hired by the company as a marketing consultant to make appearances at corporate events.

146. When Fisher claimed sexual harassment by Hurd and hired Gloria Allred to represent her, the HP board retained Covington & Burling to perform an internal investigation. Covington interviewed Hurd, McIlvaine, and other HP employees, reviewed expense records and travel schedules, and conducted forensic analysis of computers. And the results of the investigation suggested that Hurd had likely initially made false misrepresentations to the board about his relationship with Fisher and falsified his expense reports to try to cover up the affair.[23]

[23] Although HP's board found no violation of the company's harassment policy, Hurd was accused of making improper expense claims amounting to $20,000 to cover

147. Covington's investigation revealed that for two years, Hurd and Fisher had intimate meals and hotel-room encounters together around the world in which Hurd repeatedly tried to "cajole" Fisher into having sex with him. In an attempt to win her affections, Hurd also tipped Fisher off about HP's pending acquisition of EDS before it became public.

148. Based on the investigation, the HP Board fired Hurd.

149. Hurd's sudden departure cost HP shareholders billions of dollars in lost stock value and led to multiple lawsuits.

150. Ellison, however, always believe that his close friend Hurd had been badly mistreated by HP. Ellison made no secret of his thoughts on the matter and sent letters to the media blasting HP:

> In an email sent to the New York Times and later provided to Reuters by Oracle, ***Ellison slammed HP's board for ousting Hurd — a close friend — even after the PC maker's board determined Hurd had not violated its sexual harassment policy***.
>
> HP disputed Ellison's account of events.
>
> Hurd resigned on Friday after a probe into sexual harassment allegations turned up expense account abuses that HP said were intended to cover up his relationship with a female contractor.
>
> ***"The HP board just made the worst personnel decision since the idiots on the Apple (AAPL.O) board fired Steve Jobs many years ago," Ellison wrote.***
>
> "In losing Mark Hurd, the HP board failed to act in the best interest of HP's employees, shareholders, customers and partners," he said.[24]

151. Other media reports at the time quoted additional disparaging remarks from Ellison about the HP Board members and defending his friend Hurd:

---

meals, travel and, in one case, an appearance fee for the 50-year-old actress, whose film credits include restricted R-rated films such as Intimate Obsession and Body of Influence 2.

[24] *See "Oracle's Ellison Blasts HP Board for Hurd's Exit,"* REUTERS, Aug. 9, 2010.

> The software billionaire said Hurd had spent five years doing a "brilliant job" restoring HP to its "former greatness" after "a long list of failed CEOs". Ellison took particular exception to the fact that HP's board went public with the unproven allegation of sexual harassment against Hurd, claiming, without naming a source, that this was the subject of a narrow 6-to-4 vote by directors.
>
> "***Publishing known false sexual harassment claims is not good corporate governance; it's cowardly corporate governance," said Ellison***, who pointed out that a slump in HP's shares has already cost investors more than $10bn. "Those six directors caused HP to lose a nearly irreplaceable CEO."
>
> ***He added that it was "not credible" to accuse Hurd of fiddling expenses***: "Mark Hurd, like most other CEOs, does not fill out his own expense reports, so even if errors were made, Mark didn't make them. What the expense fraud claims do reveal is an HP board desperately grasping at straws in trying to publicly explain the unexplainable; how a false sexual harassment claim and some petty expense report errors led to the loss of one of Silicon Valley's best and most respected leaders."[25]

152. Less than a month later, Ellison further came to the rescue of his friend Hurd by hiring him to work at Oracle as a Co-President and member of the Board, reporting directly to Ellison. Oracle issued a press release at the time announcing Hurd's hiring by Ellison:

> REDWOOD SHORES, Calif. - September 6, 2010
>
> Oracle (NASDAQ: ORCL) today announced that Mark V. Hurd has joined Oracle as President and has been named to Oracle's Board of Directors. Mr. Hurd will report to Oracle CEO Larry Ellison.
>
> "Mark did a brilliant job at HP and I expect he'll do even better at Oracle," said Oracle CEO Larry Ellison. "There is no executive in the IT world with more relevant experience than Mark.

153. Hurd's hiring by Oracle immediately caused a huge legal dispute between Oracle and HP about the propriety of the hiring, with HP claiming that Hurd was improperly using its trade secrets to perform his new job at Oracle. But HP immediately

[25] *See* Andrew Clark, "*Oracle boss blasts Hewlett-Packard over Mark Hurd ousting*," THE GUARDIAN, Aug. 10, 2010.

approached Oracle two days after filing the lawsuit about resolving the dispute, and the parties settled the dispute the same month and formalized the agreement in a settlement agreement dated September 20, 2010. Among other things, the settlement agreement contained a statement by Oracle committing that its software would continue to support HP's Itanium platform used for HP's servers.

154. Ellison, however, continued to seethe at HP's conduct in firing Hurd and decided Oracle would not honor the settlement agreement in order to retaliate against HP for his emotionally-charged belief that HP had wronged Hurd.

155. On June 15, 2011, Hewlett-Packard Company, now Hewlett Packard Enterprise Company (HP), filed a complaint in the California Superior Court, County of Santa Clara against Oracle Corporation alleging numerous causes of action including breach of contract, breach of the covenant of good faith and fair dealing, defamation, intentional interference with prospective economic advantage, and violation of the California Unfair Business Practices Act. The complaint alleged that when Oracle announced on March 22 and 23, 2011 that it would no longer develop future versions of its software to run on HP's Itanium-based servers, it breached a settlement agreement signed on September 20, 2010 (the HP Settlement Agreement), resolving litigation between HP and Hurd. HP sought a judicial declaration of the parties' rights and obligations under the HP Settlement Agreement and other equitable and monetary relief. Oracle answered the complaint and filed cross-claims.

156. At the time, the Individual Defendants were well aware that Ellison hated the HP Board. The news reports, some of which are quoted above, were well known by them and they also heard Ellison openly rant about the HP Board members being "idiots" for firing Hurd. The Individual Defendants thus had actual knowledge that Ellison harbored and was nurturing a personal grudge against HP and its Board.

157. The Individual Defendants also had actual knowledge of the settlement agreement between Oracle and HP and Hurd because they had reviewed and approved

it. They all had actual knowledge of Oracle's requirements under the settlement agreement to continue to make Oracle's software compatible with HP's servers.

158. The Individual Defendants also had actual knowledge that Ellison's personal animosity towards HP only intensified when HP hired Leo Apotheker to be CEO and Ray Lane to be Chairman just days after HP's original lawsuit against Hurd had been settled. Apotheker came from SAP, which was an arch-enemy of Oracle and everyone knew Ellison hated both SAP and Apotheker. At the time, Ellison made public comments reported in the press fuming about HP's hiring of Apotheker and Lane.

159. Ellison's payback came quickly. Just months later, in breach of the settlement agreement, Ellison directed engineers at the Company to discontinue support for HP's Itanium platform beginning on March 22, 2011. The Defendants knew this was a breach of Oracle's legal obligations and would lead to lawsuits and potential large damages, but acceded to Ellison's directives even though they knew Ellison was motivated by improper personal reasons, not any corporate business purpose.

160. HP then sued Oracle for breaching the terms of the settlement agreement.

161. After a bench trial on the meaning of the HP Settlement Agreement, the court found that the HP Settlement Agreement required Oracle to continue to develop certain of its software products for use on HP's Itanium-based servers at no cost to HP.

162. The case proceeded to a jury trial in May 2016 on the issue of the amount of damages. Ellison was called to testify and did testify at the trial. Ellison's testimony was that he personally drafted the press release announcing that Oracle would no longer support HP's Itanium platform. When asked why he as the Chairman of the Board personally drafted the press release, Ellison testified that he was serving on a jury at the time and that he had a 15-minute break with nothing to do, so he drafted the press release and then sent it to Defendant Safra Catz and told her to send it out.

163. The evidence at trial also demonstrated that Ellison not only personally orchestrated the discontinuance of the support and personally wrote the press release,

but that the timing of the announcement was designed to inflict maximum damage to HP – the press release was issued the day of HP's annual meeting, and thus resulted in a major disruption for HP as it was left flat-footed and unprepared to explain the breaking news story that its Itanium platform would no longer be supported by Oracle. HP's customers were extremely concerned, as were analysts concerned about the effect of Oracle's move on HP's earnings and profits.

164. Ellison's vendetta was successful in the sense that HP suffered a massive loss of revenue and profits as customers canceled orders and stopped making purchases from HP – no customer wanted to buy an extremely expensive product that was no longer supported.

165. The cost of the vendetta was not borne by Ellison, however – it was borne by Oracle and its shareholders.

166. On June 30, 2016, the jury returned a verdict in favor of HP on its claims for breach of contract and breach of the implied covenant of good faith and fair dealing and against Oracle on its cross-claims. ***The jury awarded HP $3.0 billion in damages***. Under the court's rulings, HP is entitled to post-judgment interest, but not pre-judgment interest, on this award.

167. After the trial court denied Oracle's motion for a new trial, Oracle filed a notice of appeal on January 17, 2017. On February 2, 2017, HP filed a notice of appeal of the trial court's denial of pre-judgment interest. Oracle filed its opening brief on March 7, 2019. Briefing on the appeal was completed November 1, 2019, and the appellate court has not yet scheduled a date for oral argument.

168. Oracle has been forced to post, at great expense, a mandated surety bond with the trial court for the amounts owing. However, despite the judgment, the Individual Defendants have failed to cause Oracle to record any charge to its financial results of operations or any reserve for the amount owed to HP. Moreover, since the judgment is entitled to the statutory 10% interest, the amount owed continues to rise

substantially and is now well in excess of $4.0 billion.

169. These events amply demonstrate the need for an independent Chairman of the Board at Oracle. The entire massive $4.0 billion and counting liability to HP was caused by Ellison's pursuit of a meritless and personal vendetta against HP's Board for firing his close friend Mark Hurd and its subsequent hiring of Leo Apotheker. To seek revenge, Ellison caused Oracle to breach the terms of its written settlement agreement with HP. In its defense, Oracle falsely claimed that Intel was already discontinuing support for the Itanium platform at the time Oracle made its decision in March 2011. The jury rejected that assertion at the trial since the evidence demonstrated that Intel had not in fact discontinued support.

170. There was no business purpose for Ellison's conduct, and the lack of an independent Chairman at the time (which continues to the present day) resulted in substantial harm to the Company.[26] However, to protect Ellison and because they are dominated and controlled by Ellison, the Individual Defendants continued to make statements at all relevant times to the effect that Oracle does not need an independent Chairman and that the Company's current governance structure with Ellison as Chairman is functioning effectively and is in Oracle's best business interests. As the facts above demonstrate, none of the Individual Defendants believed these statements at the time they were made, demonstrating the false and misleading nature of the statements.

---

[26] Ellison was not Chairman at the time, but the Chairman was Defendant Henley, who was not independent because he served for years as Oracle's CFO before being named Chairman. The 2010 Proxy Statement admitted that Henley was not independent because he was an employee of the Company: "The Board will continue to be composed of four employee directors (Messrs. Ellison, Hurd and Henley, and Ms. Catz) and eight independent directors." *See* 2010 Proxy at p. 21.

### I. The Unjust Compensation Awarded to the Individual Defendants

171. Some of the Defendants received unjust compensation and/or compensation and payments that were higher due to Defendants' wrongdoing and because the Company was more profitable by paying Black individuals and minorities less.

172. To be sure, Defendant Ellison, as the Company's largest shareholder, received substantially more in dividends from his Oracle stock than he would have but for the wrongdoing. If Black and minority employees working at Oracle had received fair and equal pay, Oracle would have had higher compensation expenses and thus the dividend payments would have been lower. Again, Ellison was the largest beneficiary of the inflated dividend payments because he owns 35.4% of the stock of the Company, as reflected in the attached chart from the 2019 Proxy Statement which presented information, as of September 20, 2019 with respect to the beneficial ownership of Oracle common stock:

| Name of Beneficial Owner | Amount and Nature of Beneficial Ownership (1) | Percent of Class |
|---|---|---|
| **Directors and NEOs** | | |
| Lawrence J. Ellison (2) | 1,172,919,853 | 35.4% |
| Jeffrey S. Berg (3) | 449,316 | * |
| Michael J. Boskin (4) | 359,796 | * |
| Safra A. Catz (5) | 22,806,092 | * |
| Bruce R. Chizen (6) | 275,813 | * |
| George H. Conrades (7) | 99,809 | * |
| Dorian E. Daley (8) | 920,817 | * |
| Rona A. Fairhead (9) | — | * |
| Hector Garcia-Molina (10) | 256,419 | * |
| Jeffrey O. Henley (11) | 4,934,516 | * |
| Mark V. Hurd (12) | 21,776,255 | * |
| Renée J. James (13) | 39,917 | * |
| Charles W. Moorman IV (14) | 11,015 | * |
| Leon E. Panetta (15) | 68,562 | * |
| William G. Parrett | 8,561 | * |

| | | |
|---|---|---|
| Edward Screven (16) | 6,043,113 | * |
| Naomi O. Seligman (17) | 157,207 | * |
| All current executive officers and directors as a group (18 persons) (18) | 1,231,596,441 | 36.6% |

173. Much of the information about the exact amount of the unjust payments is not publicly available, and has been fraudulently concealed by Defendants. As a result, Plaintiff requires discovery in order to properly allege the full extent and details of the Defendants' wrongdoing.

174. However, at a minimum, based on publicly available information, Defendant Ellison and other Defendants have received substantial unjust compensation from the dividends. Oracle's most recent dividend payment was $0.24 per share on April 23, 2020, and in the last 12 months, the Company paid a total of $0.96 per share. Oracle paid out approximately 29% of its profit in 2019 in dividends. Because Ellison owned 1,172,919,853 shares in 2019, and Oracle paid dividends of $0.96 per share in 2019, Ellison received over $1 billion in dividends in 2019 alone -- $1,126,003,059.

175. Defendant Catz received dividends in 2019 of $ 21,893,848.

176. Defendant Henley received dividends in 2019 of $4,737,135, Berg received dividends in 2019 of $431,343, Boskin received dividends of $345,404, Chizen received dividends of $264,780, Garcia-Molina received dividends of $246,162, Conrades received dividends of $95,817, Panetta received dividends of $65,820, and Moorman and Parrett received $10,574 and $8,219, respectively. These dividend payments were higher than they would have been but for the lower wages paid to Black, female, and minority employees. Moreover, given the fact that the government has alleged that Oracle has discriminated in wages paid to Black, female, and minority employees since at least 2014, the Individual Defendants received, at a minimum, inflated and unjust dividend payments from Oracle since such time.

177. The total amount of the excess payments, upon information and belief, exceeds $1 billion. The Individual Defendants' receipt of this compensation during the

relevant time period was unjust in light of their direct participation in the wrongful conduct alleged herein, which constituted bad faith and disloyal conduct. The Defendants' receipt of such compensation while they were knowingly or recklessly breaching their fiduciary duties to the Company constitutes unjust compensation that should be recouped by Oracle.

178. The following table provides additional information regarding some of the Officer Defendants' compensation during part of the relevant time period:

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Stock Awards (2) ($) | Option Awards (3) ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation (4) ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| **Lawrence J. Ellison** (1) | 2019 | 1 | — | — | — | — | 1,662,827 | 1,662,828 |
| *Chairman and Chief Technology* | 2018 | 1 | — | — | 103,700,000 | 3,612,553 | 1,619,089 | 108,931,643 |
| *Officer* | 2017 | 1 | — | 22,190,625 | 16,863,075 | 705,464 | 1,513,042 | 41,272,207 |
| **Safra A. Catz** | 2019 | 950,000 | — | — | — | — | 15,981 | 965,981 |
| *Chief Executive Officer* | 2018 | 950,000 | — | — | 103,700,000 | 3,612,553 | 19,780 | 108,282,333 |
| | 2017 | 950,000 | — | 22,190,625 | 16,863,075 | 705,464 | 20,801 | 40,729,965 |
| **Mark V. Hurd** | 2019 | 950,000 | — | — | — | — | 1,531,646 | 2,481,646 |
| *Chief Executive Officer* | 2018 | 950,000 | — | — | 103,700,000 | 3,612,553 | 32,470 | 108,295,023 |
| | 2017 | 950,000 | — | 22,190,625 | 16,863,075 | 705,464 | 123,115 | 40,832,279 |
| **Edward Screven** | 2019 | 700,000 | — | 33,460,000 | — | — | 8,619 | 34,168,619 |
| *Executive Vice President, Chief Corporate Architect* | 2018 | 600,000 | — | 11,918,750 | — | 463,068 | 8,781 | 12,990,599 |
| **Dorian E. Daley** | 2019 | 825,000 | 400,000 | 6,766,500 | — | — | 8,291 | 7,999,791 |
| *Executive Vice President and General Counsel* | | | | | | | | |
| **Jeffrey O. Henley** | 2019 | 650,000 | — | — | 3,556,000 | — | 8,615 | 4,214,615 |

179. The Officer Defendants' compensation during the relevant period was also unjust because it significantly exceeded the average employees' pay, as disclosed by the Company in its Proxy:

> **CEO PAY RATIO**
>
> In accordance with SEC rules, we are providing the ratio of the annual total compensation of our CEOs to the annual total compensation of our median compensated employee (the median employee).
>
> Using Ms. Catz's fiscal 2019 total compensation, the ratio of CEO to median employee annual total compensation is 12 to 1. Using Mr. Hurd's fiscal 2019 total compensation, the ratio of CEO to median employee annual total compensation is 30 to 1. The fiscal 2019 total compensation of

Ms. Catz and Mr. Hurd was $965,981 and $2,481,646, respectively. The fiscal 2019 total compensation of our median employee was $83,813.

180. If Defendant Hurd's 2019 pay was more than 30 times the median employee's compensation, then it must have been an even higher multiple of the median Black or minority employee's compensation given the government's allegations that Oracle unlawfully paid such employees less than other employees for similar jobs.

181. When viewed in light of these facts, the Defendants' compensation was unjust under equitable principles.

182. The following chart provides information about the compensation that the Director Defendants received during 2019:

| Name (1) | Fees Earned or Paid in Cash ($) | Stock Awards (2) (3) ($) | Total ($) |
|---|---|---|---|
| Jeffrey S. Berg | 122,500 | 456,326 | 578,826 |
| Michael J. Boskin | 102,500 | 588,819 | 691,319 |
| Bruce R. Chizen | 107,500 | 456,326 | 563,826 |
| George H. Conrades | 117,500 | 588,819 | 706,319 |
| Hector Garcia-Molina | 67,500 | 392,562 | 460,062 |
| Renée J. James | 52,500 | 392,562 | 445,062 |
| Charles W. Moorman IV | 73,288 | 392,562 | 465,850 |
| Leon E. Panetta | 92,500 | 392,562 | 485,062 |
| William G. Parrett | 73,288 | 392,562 | 465,850 |
| Naomi O. Seligman | 77,500 | 392,562 | 470,062 |

183. The following table provides additional information concerning the stock awards (in the form of RSUs) and stock options held by the Company's non-employee directors as of the last day of fiscal 2019.

| Name | Total Unvested RSUs Outstanding at Fiscal 2019 Year End (#) | RSUs Granted During Fiscal 2019 (a) (#) | Total Option Awards Outstanding at Fiscal 2019 Year End (#) |
|---|---|---|---|
| Jeffrey S. Berg | ,189 | ,189 | 47,500 |
| Michael J. Boskin | 1,857 | 1,857 | 50,000 |

| | | | |
|---|---|---|---|
| Bruce R. Chizen | ,189 | ,189 | 25,000 |
| George H. Conrades | 1,857 | 1,857 | 7,500 |
| Hector Garcia-Molina | ,905 | ,905 | 25,000 |
| Renée J. James | ,491 | ,905 | ,375 |
| Charles W. Moorman IV | ,905 | ,905 | |
| Leon E. Panetta | ,905 | ,905 | 7,500 |
| William G. Parrett | ,905 | ,905 | |
| Naomi O. Seligman | ,905 | ,905 | 02,500 |

184. The Defendants' compensation, excess dividends, and stock awards detailed herein were unjust and should be disgorged or returned by such Defendants because they acted in bad faith and in a disloyal manner by virtue of the conduct alleged in this complaint.

## VIII. THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES

185. The Company has suffered significant harm and damages due to Defendants' wrongdoing and breaches of duties.

186. As a direct and proximate result of the Individual Defendants' conduct, the Company has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to, the amounts paid to outside lawyers, accountants, and investigators in connection with internal and external investigations into issues pertaining to the lack of diversity at Oracle, discrimination lawsuits, harassment claims, wrongful termination lawsuits, and lack of pay equity claims.

187. On January 19, 2017, for example, Oracle was sued by the Department of Labor for racial discrimination and for its "systemic practice" of paying white male workers more than their non-white and female counterparts with the same job titles, causing the Company to suffer severe damage to its goodwill and causing Oracle to pay millions of dollars in attorneys' fees to defend the case.

188. In November 2019, a Congressional inquiry was launched into the lack of diversity on Oracle's Board. Oracle was required to expend significant attorneys' fees, expenses, and consultant fees responding to this inquiry, which would not have been commenced but for Defendants' wrongdoing and false statements about commitment to diversity in the Company's proxy statements.

189. On January 17, 2017, the DOL's Office of Federal Contract Compliance Programs sued Oracle in an ALJ court, alleging that Oracle systematically discriminated against African Americans, Asians and women with respect to employment compensation. The government alleges Oracle discriminated against these groups and showed favoritism and bias towards Asians.

190. On June 30, 2016, a $3.0 billion verdict was entered against the Company and in favor of Hewlett Packard due to the Company's intentional breach of a settlement agreement related to Mark Hurd's departure from HP. Ellison and the Director Defendants caused the Company to breach that agreement because Ellison took personal umbrage at the manner of Hurd's firing and therefore caused Oracle to attempt to punish HP by breaching the agreement even though Oracle's obligations under the settlement agreement were clear.

191. Moreover, Oracle's reputation, goodwill, and market capitalization have been harmed as a result of the Individual Defendants' misconduct.

192. Further, as a direct and proximate result of the Individual Defendants' actions, Oracle has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from having to hire new employees, as employees have quit in protest over Defendants' misconduct and the discriminatory practices employed by Oracle;

(b) costs incurred from defending and paying settlements in discrimination lawsuits, since the Individual Defendants' wrongdoing caused

discrimination to proliferate at Oracle;

(c) costs incurred from defending and settling governmental investigations into the Individual Defendants' misconduct;

(d) loss of reputation; and

(e) costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Oracle.

## IX. DEMAND FUTILITY

193. Plaintiff brings this action derivatively in the right and for the benefit of Oracle to redress injuries suffered, and to be suffered, by Oracle and its stockholders as a direct result of the Officer Defendants' violations of federal securities laws and breaches of fiduciary duties.

194. Oracle is named as a nominal defendant solely in a derivative capacity.

195. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

196. At the time this action was commenced, Oracle's Board consisted of the following 14 members: Defendants Ellison and Catz, as well as Directors Henley, Berg, Boskin, Chizen, Conrades, Garcia-Molina, James, Moorman, Panetta, Parrett, and Seligman.

197. Plaintiff has not made any demand on Oracle to institute this action because such a demand would be a futile, wasteful, and useless act.

198. Under Delaware law, demand is futile if a majority of the directors are either interested in or not independent of a person interested in the claims asserted. Further, where a board is made up of an even number of directors, a majority of directors is considered to be half the Board.

199. Based on these principles, demand is futile here if seven (7) of the fourteen (14) directors are either interested in or not independent of a person interested in the claims asserted herein. As discussed below, demand is futile because (i) the Officer

Defendants face a substantial likelihood of liability for violating the federal securities laws and breaching their duty of due care, and (ii) at least four other directors are not independent of the Officer Defendants.

### A. Demand Is Futile Against the Officer Defendants

200. The Officer Defendants served as officers of Oracle (and directors) during the Relevant Period. As officers, the Officer Defendants face a substantial likelihood of liability if there is reason to doubt that they breached their duty of care — *i.e.*, acted with gross negligence.

201. As alleged above, the Officer Defendants knowingly or recklessly made or disseminated materially false and misleading statements regarding the Company's diversity, board qualifications, efforts to recruit minorities, and lack of need for an independent Chairman. As such, the Officer Defendants face a substantial likelihood of liability for violating their fiduciary duties of candor and good faith and the federal proxy laws. The Officer Defendants also knowingly allowed Ellison to pursue his personal vendetta against Hewlett-Packard for firing his close personal friend Mark Hurd. There was no business purpose for Ellison engaging in this conduct, and the Officer Defendants knew it and knew Ellison was risking massive damages to the Company by pursuing his personal vendetta, yet still fully cooperated with Ellison in the baseless dispute and lawsuit with HP. Demand is futile as to the Officer Defendants for this conduct which has resulted in a $3 billion judgment against Oracle that the Company admits may be material from a financial point of view to the Company.

202. For these reasons, demand is futile against the Officer Defendants.

### B. Demand Is Futile Against a Majority of the Board Who Are Not Officer Defendants Due to a Lack of Independence, Because Ellison Controls Oracle and Its Board

203. Because Defendants Ellison and Catz, face a substantial likelihood of liability, demand is futile if four of the remaining ten directors lack independence from Defendants Ellison or Catz. As discussed herein, Defendant Ellison has complete control

over the Board with deep ties to many of the Non-Party Directors, which renders them incapable of assessing a demand.

204. Ellison is the founder and controlling stockholder, and the chief technology officer of Oracle. Ellison dominates and controls the Board due to his ownership interests and position, and his domination of the Board. As of September 20, 2019, Defendant Ellison owned 1,172,919,853 shares of Oracle stock, giving him control and ownership of 35.4% of the voting power of Oracle common stock.

205. Ellison's 35.4% stock ownership, combined with the other facts alleged herein, demonstrate that Ellison is the controlling shareholder of Oracle, and that he dominates and controls the Board. As a result of Ellison's control and influence as the founder of Oracle, no director could ever be appointed or reelected to the Board over Ellison's objections. As part of his effort to control the Board, Ellison richly rewards those who demonstrate their loyalty to him, and purges those who question his decisions or otherwise threaten his leadership.

206. Ellison has spent his entire career ensuring that only his loyalists are allowed to occupy Board and executive positions at Oracle. Karen Southwick, the author of an Ellison biography entitled *Everyone Else Must Fail*, has written that, "Ellison has created Oracle in his own image" and that "[n]o other large company is as dominated by a single individual."

207. Southwick's research included interviews with many former high-ranking Oracle executives, as well as Oracle customers, competitors and partners. Marc Benioff, a former Oracle executive in marketing and product management who went on to found Salesforce.com, was quoted in *Everyone Else Must Fail* as stating, "Larry's like a spiritual guru, and Oracle is like a cult."

208. As part of his continued effort to maintain complete control over the Company, Ellison has developed a reputation for richly rewarding executives who display personal loyalty, while summarily purging any who pose a perceived threat to

his leadership. As one former Oracle director told Forbes magazine, "This is a team, and Larry is the only captain. If someone wants to pop up and announce they're the star — poof! You're out."

209. In a similar vein, former technology journalist Alex Vieux has explained: "Larry has an acute sense of when he doesn't need people anymore. He's like a juicer. He squeezes people dry and then discards them. I've seen it with [former Oracle Executive Vice President] Gary Bloom, [former Oracle President and Chief Operating Officer] Ray Lane, [former Vice President of Oracle USA sales and service] Gary Kennedy, [former Oracle marketing executive] Terry Garnett. At the same time, he gives them good money and exposure they would never get without him. They get a springboard to do whatever they want with their lives. He fulfills his part of the bargain, but he does it in a very devilish way."

210. Former Board member Joe Costello was quoted in Southwick's biography as stating that Ellison treats the Oracle Board as a "necessary inconvenience." Costello was driven off of the Oracle Board by Ellison after Costello's own company, Cadence Design Systems, selected an Oracle competitor for a particular contract. Ellison was so incensed by this perceived betrayal that he threatened to ruin Costello and Costello's reputation, to the point where Costello resigned. Lane stated that, "[Costello] was a very valuable board member, and his resignation should have sent a signal to everyone: the board serves at Larry's will."

211. Ellison has repeatedly fired or otherwise forced out high-ranking Oracle executives, including members of the Board, over personality conflicts or perceived threats to his leadership.

212. According to Forbes, "Silicon Valley is littered with refugees from Oracle Corp., former acolytes who fled for better jobs or were fired after fighting with strongman Larry Ellison." For example, Oracle President, Chief Operating Officer and Director Ray Lane was forced to resign in June 2000 — three weeks before

approximately $70 million in options were about to vest (and thus that Lane forfeited) — after conflicting with Ellison over the leadership of Oracle. As recounted in an Ellison biography by Matthew Symonds called *Softwar: An Intimate Portrayal of Larry Ellison and Oracle (2003)*, when Ellison reclaimed the title of President, he told Lane that, "The whole company needs to understand that there is one centralized point of authority, and it will be the CEO."

213. Similarly, Oracle Executive Vice President Gary Bloom, once thought of as a possible successor to Ellison, left Oracle because Ellison began to oppose him and expressed favoritism to Ellison's longtime loyalist Safra Catz. As recounted in the Symonds' Ellison biography, Bloom stated, "It got to a point where I was responsible for the vast majority of the company, yet I had no contact with the guy who actually ran the company."

214. Terence Garnett is another Oracle executive who was pushed out of Oracle after conflicting with Ellison. After his June 1994 firing, Garnett alleged that Ellison had instructed him to steer business opportunities and Oracle corporate resources to Ncube Corp., a company owned by Ellison, and directed Oracle engineers to develop software that would run better on Ncube computers than on competing machines. Because Garnett refused to follow those instructions, Ellison had him summarily removed from the Company.

215. Other members of the current Board have also publicly acknowledged Ellison's dominance over Oracle's corporate governance. For example, at an Oracle stockholder meeting in October 2008, Berg stated, "I guess as a founder, owner, operator, you can equate [Ellison] to the owner of a team who can sit up in a skybox and own the franchise."

216. This statement demonstrates that the Board is subservient to Ellison, cannot legitimately exercise independent business judgment regarding matters where Ellison is an interested party, and does not appreciate that Oracle's stockholders are the

ones who truly "own the franchise."

217. Further, while Ellison is no longer CEO and has assumed the position of chief technology officer and "full time" Executive Chairman, his dominance over Oracle has remained unchanged. Analysts and others in the industry acknowledged Ellison's continued dominance following the announcement of his stepping down: "He's not going anywhere," said Tim Bajarin, tech analyst and president of Creative Strategies.

- The shift "doesn't really change things," said Scott McNealy, former Sun Microsystems CEO (which Oracle eventually acquired) and current chairman of social media marketing start-up Wayin. "He's going to continue to do the things he's going to continue to do."
- Mike Wilson, author of "The Difference Between God and Larry Ellison: God Doesn't Think He's Larry Ellison" stated, "Oracle is Larry Ellison, and Larry Ellison is Oracle."
- Marc Benioff, CEO of Salesforce.com, who worked at Oracle and got funding for his company from Ellison stated, "There always has been & always will be, one CEO at Oracle. 'All [software] & [hardware] engineering functions will continue to report to @larryellison.'"

218. Further, as discussed below, each director or officer has received significant compensation while serving as a fiduciary of Oracle. Given Defendant Ellison's prominent role in retaining the employ of these individuals, as well as their material ties to Ellison, Defendant Catz, and the Non-Party Directors below, are incapable of assessing demand as to the claims alleged herein.

### C. A Majority of the Director Defendants Knowingly Endorsed and Approved Ellison's Baseless Lawsuit With HP, Which Merely Represented a Personal Vendetta Against HP by Ellison, Who Was Mad That HP Had Fired His Close Personal Friend Hurd

219. The Director Defendants also knowingly allowed Ellison to pursue his personal vendetta against Hewlett-Packard for firing his close personal friend Mark Hurd. There was no business purpose for Ellison engaging in this conduct, and the

Director Defendants knew it and knew Ellison was risking massive damages to the Company by pursuing his personal vendetta, yet still fully cooperated with Ellison in the baseless dispute and lawsuit with HP. Demand is futile as to the Director Defendants for this conduct which has resulted in a $3 billion judgment against Oracle that the Company admits may be material from a financial point of view to the Company, yet for which the Company continues to refuse to take a reserve on its balance sheet.

220. The lawsuit with HP has been ongoing since June 15, 2011, and remains ongoing in the court of appeal. All Director Defendants have served on the Board during at least part of this time period. As the Company admits in its most recent Form 10-K filed on June 22, 2020:

> The case proceeded to a jury trial in May 2016. On June 30, 2016, the jury returned a verdict in favor of HP on its claims for breach of contract and breach of the implied covenant of good faith and fair dealing and against Oracle on its cross-claims. ***The jury awarded HP $3.0 billion in damages. Under the court's rulings, HP is entitled to post-judgment interest, but not pre-judgment interest, on this award.***
>
> After the trial court denied Oracle's motion for a new trial, Oracle filed a notice of appeal on January 17, 2017. On February 2, 2017, HP filed a notice of appeal of the trial court's denial of pre-judgment interest.
>
> Oracle has posted a mandated surety bond with the trial court for the amounts owing. No amounts have been paid or recorded to our results of operations. We continue to believe that we have meritorious defenses against HP's claims, and we intend to present these defenses to the appellate court. Oracle filed its opening brief on March 7, 2019. Briefing on the appeal was completed November 1, 2019, and the appellate court has not scheduled a date for oral argument. We cannot currently estimate a reasonably possible range of loss for this action due to the complexities and uncertainty surrounding the appeal process and the nature of the claims. Litigation is inherently unpredictable, and the outcome of the appeal process related to this action is uncertain. ***It is possible that the resolution of this action could have a material impact on our future cash flows and results of operations***.

### D. A Majority of Directors Have Material Ties to Ellison Rendering Them Incapable of Assessing Demand Against the Officer Defendants

#### 1. Defendant Catz

221. Defendant Catz is beholden to Ellison and incapable of objectively evaluating matters concerning Ellison. Catz is not independent because she is a highly

compensated senior officer in a company controlled by Ellison. Catz has held numerous executive positions at Oracle since joining the Company in 1999. Catz has been Oracle's CEO since September 2014. She served as the Company's President from January 2004 to September 2014 and as CFO most recently from April 2011 until September 2014. Previously, she served as CFO from November 2005 until September 2005 and as interim CFO from April 2005 to July 2005. Since 2007, Catz has received roughly $514 million in compensation from Oracle. Due to her position as CEO, and her massive pay packages, the Company admits that Catz is not independent.

222. Catz is also a close aide to Ellison who has been described in the media by CNNMoney and Fortune as Ellison's "secretive but effective right hand," "Ellison's ultra-effective consigliere," and "Ellison's Ms. Inside." According to the Mercury News, "[a]t one point, Ellison and Catz dated, according to two biographies of Ellison and interviews with former Oracle employees. They remained friends over the next decade." Matthew Symonds wrote in his Ellison biography that Catz has "a degree of loyalty to her boss that transcended any personal agenda of her own." Ellison himself has stated that he and Catz "share a high-bandwidth communications link," that they "finish each other's sentences" and that he relies on her as his "chief confidante and counselor." As explained in the Symonds' biography, Catz has said that, "I came in [to Oracle] with absolutely no agenda other than to help Larry. That actually makes my job incredibly easy. If Larry wants something done, now it happens because I'm going to check that it has."

223. Catz's power and status within Oracle derive from her close personal relationship and overwhelming loyalty to Ellison. In August 2006, Henley was quoted in Forbes as saying that, "[Catz's] power isn't that she has a lot of people working for her; she doesn't. Her power is that she's on the same wavelength as Larry." Catz herself appears to agree with this assessment. She is quoted in the Symonds' biography as stating, "I'm not interested in building power and I don't have any individual power

here. People will send me things for my approval, and my response will always be okay, if it's within the scope of a decision I already know Larry has approved. I say that as a reminder that I don't have any power of my own."

224. Although this statement was made while Catz was Co-President under then-CEO Ellison, Ellison still holds the reins at Oracle in his CTO role.

**2. Director Henley**

225. Director Henley is not independent of Defendant Ellison, and by extension Defendant Catz, due to his long-standing ties to Oracle as the Company's former CFO and Chairman. For ten years, from 2004 to 2014, Henley served as Executive Chairman at Oracle, and Oracle's Proxy Statement at the time stated that Henley was not an independent director. When Ellison stepped down from CEO to assume the CTO position in 2014, Ellison assumed the Chairman position and Henley was demoted to Vice Chairman of Oracle. While Oracle no longer publishes Henley's compensation or outstanding unvested stock options, as recently as fiscal year 2011, Henley received approximately $4.15 million in compensation and $11.333 million in stock option awards. The Company admits in its public filings that Henley is not independent.

**3. Director James**

226. Director James is not independent of Defendant Ellison, and by extension Defendant Catz, due to her receipt of substantial compensation from Oracle. James has received and will continue to receive substantial compensation as a director of Oracle. Since 2016, Director James has received over $1.6 million in cash and stock awards — a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years. As a member of one of the highest compensated board of directors in the United States, Director James expects to receive roughly half of a million dollars or more per year as a director.

227. James is an Operating Executive at the Carlyle Group. In that capacity, she serves on the boards of Veritas Holdings Ltd. and ION Investment Group Limited,

two Carlyle portfolio companies. Veritas specializes in information management, and Oracle is an important Veritas partner. Indeed, in a 2017 interview, Veritas's CTO discussed "the 'very long future that the two companies have together working on the problem of information management.'" ION, a software conglomerate, has a business segment that is "a Gold level member of the Oracle Partner Network." Catz publicly described James as a close friend at Oracle's 2014 OpenWorld conference.

228. Until 2016, James served as Intel's President. Since then, she has publicly stated that she is trying to become the CEO of another large technology company. In a talk at Stanford, James described her approach to dealing with boards of directors: "When you're CEO, it's all about the board. If you have a dysfunctional board and a board that isn't supportive or that has [its] own internal dynamic and politics, life's too short for that." In that same talk, James also said that "people do what they think the CEO wants, even if they know it's wrong. And that's a very dangerous phenomenon." Moreover, in October 2017, the Oracle Board determined that James was no longer independent under the New York Stock Exchange's listing standards. The reason: James had been appointed CEO of Ampere Computing LLC, a joint venture between Oracle, Carlyle, and MACOM Technology Solutions Holdings, Inc., in which Oracle made a $46 million investment towards in October 2017.

#### 4. Director Seligman

229. Director Seligman is not independent of Defendant Ellison, and by extension Defendant Catz, due to her substantial compensation from Oracle and close personal ties to Defendant Ellison. Seligman has received and will continue to receive substantial compensation as a director of Oracle. Since 2006, Director Seligman has received over $5.3 million in cash and stock awards — a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years. As a member of one of the highest compensated board of directors in the United States, Director Seligman expects to receive roughly half

of a million dollars or more per year as a director.

230. Seligman also has ties to Ellison, which render her unable to independently evaluate matters concerning Ellison. Seligman and her husband, Ernest von Simson ("von Simson"), co-founded the Research Board, a private sector think tank and forum, serving top Chief Information Officers of over 100 of the largest firms in North America and Europe, and Ostriker von Simson, a consultancy that works with large global enterprises to advise them on choosing and deploying technologies and software, which gave them an insider look at the IT industry. Ellison is one of the credited guest speakers to have spoken before both the Research Board and the CIO Strategy Exchange (which is chaired by Ostriker von Simson). Through their co-founded entities, Seligman and von Simson came to know and admire the leadership "giants" of the IT sector, including Ellison. In von Simson's book, *"The Limits of Strategy: Lessons in Leadership from the Computer Industry,"* von Simson deems Ellison one of the "Star Walkers," along with Michael Dell, Steve Jobs, Scott McNealy and Bill Gates, all of whom are central to the book's narrative.

231. Additionally, in 2010, Seligman's husband published a book that provides the following description of his first interaction with Ellison after Research Board was sold: "At the end [of an Ellison presentation], he spotted me and flashed a huge grin. Walking me, arm around my shoulder, to the side of the stage and away from his Gartner hosts, he said, 'I hope you really made them pay for the RB.' I was touched." Ellison ended up writing a blurb for the book. That book mentions that Seligman and her husband have known Ellison since the late 1980s and have had "numerous interactions over the subsequent years, including lunch at Ellison's Silicon Valley estate."

232. Further, Seligman owns two condos on the 140-square-mile island of Lanai in Hawaii, which Ellison acquired in 2012 for $300 million. As a result of Ellison's purchase of Lanai, Ellison owns nearly everything on the island, including many of the commercial buildings, homes, and apartments, the Four Seasons hotels and golf courses,

the water company and utilities, half the roads, one of the two grocery stores, the community center and pool, the movie theater and some 88,000 acres of land (2% of the island is owned by the government or by longtime Lanai families). According to The New York Times, Ellison formed Pulama Lanai to run the operations of the island and which employs a majority of the adults on the island. Pulama Lanai has been reported to be a vast and mostly uncommunicative force. At the time of Ellison's Lanai purchase Seligman's husband, Ernest von Simson, was the long-time President of their condo association (Ernest von Simson remains Secretary and Treasurer of the condo association). Seligman's condos are located 1.1 miles (driving distance) from the Four Seasons Resort Lanai and overlook one of the golf courses. With ownership of these residences comes the eligibility to become a member of the Island Club which provides access to all Four Seasons' facilities and golf courses for half price membership.

233. Seligman and her husband are also one of four couples making up the "Champion" donors category (the highest donor circle for individual donors) to the TriLanai, which offers races on the Hawaiian Island of Lanai and is sponsored in part by Ellison-owned Pulama Lanai (that runs the operations of the island). Tri-Lanai also lists Ellison-owned hotels, the Four Seasons Resort Lanai and Hotel Lanai, as recommended accommodations. The other two members of the condo association Board where Seligman lives are also sponsors of the TriLanai.

**5. Director Conrades**

234. Director Conrades is not independent of Defendant Ellison due to his long-standing position as a director of Oracle and his prior involvement in approving conflicted transactions between Oracle and Ellison. Director Conrades has received substantial and will continue to receive compensation as a director of Oracle. Since 2008, Director Conrades has received over $4.8 million in cash and stock awards — a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years. As a member of one of the highest

compensated board of directors in the United States, Director Conrades expects to receive roughly half of a million dollars or more per year as a director.

235. Conrades has held multiple high-level positions at Akamai Technologies Inc., and Oracle and Akamai have "made substantial purchases from each other." While Conrades was Executive Chairman of Akamai Technologies, Inc. ("Akamai"), Akamai received over a million dollars from transactions between Akamai and Oracle.

236. Conrades is also a major investor in and director of MyTaskIt, a software startup. MyTaskIt's Chief Technology Officer is Michael Russo, a Senior Director of Development at Oracle. Russo needs Oracle management's approval to continue working at MyTaskIt.

237. Further, Conrades is Partner Emeritus at Polaris Venture Partners and Managing Partner at Longfellow Venture Partners; both are venture capital firms focused on areas in which Oracle is an active acquirer. Polaris and Longfellow have portfolio companies that rely on Oracle technology or are managed by former Oracle executives.

**6. Director Berg**

238. Director Berg is not independent of Defendant Ellison, and by extension Defendant Catz, due to his long-standing position as a director of Oracle and his prior material connection to Ellison and his family throughout his professional career.

239. Director Berg has received and will continue to receive substantial compensation as a director of Oracle. Since 2009, Director Berg has received over $6.3 million in cash and stock awards — a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years. As a member of one of the highest compensated board of directors in the United States, Director Berg expects to receive roughly half of a million dollars or more per year as a director.

240. Berg has also been an agent in the entertainment industry for more than 35

years. Berg has served as chairman of Northside Services, LLC, a media and entertainment advisory firm, since May 2015. He was chairman of Resolution, a talent and literary agency he founded, from 2013 until 2015. Between 1985 and 2012, Berg was the chairman and CEO of International Creative Management, Inc. ("ICM"), a talent agency for the entertainment industry.

241. According to the Los Angeles Times, ICM represented David Ellison, Larry Ellison's son, in his initial interest in an acting career. When David Ellison was approached about financing "Flyboys," "[David] Ellison approached his father [Larry Ellison] and, with the help of Jeffrey Berg at International Creative Management, eventually fashioned a deal," which accounted for 'less than 30%' of the $60 million in production costs." ICM also acted as the U.S. sales agent for "Flyboys," and Berg himself organized the party for "Flyboys," held on Larry's Ellison's yacht at the time, the Rising Sun.

242. Despite a lengthy career as an agent, Berg was essentially ousted from ICM in 2012 after a bitter power struggle with ICM founding partner Chris Silbermann, started his own entertainment agency Resolution in 2013, which shuttered within 18 months, and now runs a small agency Northside Services, LLC. According to company information database buzzfile.com, Northside Services, LLC is currently estimated to have 4 employees and annual revenues of $211,032, making his Oracle compensation material based on publicly available compensation information for other business ventures.

**7. Director Boskin**

243. Director Boskin is not independent of Defendant Ellison, and by extension Defendant Catz, due to his lucrative compensation as a director and Ellison's ties to his employer, Stanford University.

244. Director Boskin has received and will continue to receive substantial compensation as a director of Oracle. Since 2009, Director Boskin has received over $9.4

million in cash and stock awards – a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years. As a member of one of the highest compensated board of directors in the United States, Director Boskin expects to receive roughly half of a million dollars or more per year as a director.

245. Boskin is the Tully M. Friedman Professor of Economics and Hoover Institution Senior Fellow at Stanford University, where he has been on the faculty since 1971. Stanford University has close ties to Ellison and Oracle:

- Ellison's The Lawrence Ellison Foundation has made nearly $3 million in donations to Stanford in the past 3 years.
- Oracle has made donations to Stanford each year for at least the past 10 consecutive years, and in fiscal year 2016 alone has donated between $19 and $30 million to Stanford.
- According to Oracle's Annual Proxy Statement, for at least the past 10 years, Stanford has received various donations from Board members, and Board Members (in addition to Boskin and Garcia-Molina) have served and continue to serve on advisory or oversight boards or are otherwise employed part-time by Stanford University.
- Oracle is Stanford University's Strategic Partner.
- Oracle is a founding member of the Stanford Medicine Corporate Partners program, which supports the development of the new Stanford Hospital, pursuant to which Oracle has granted Stanford $25 million over 10 years.

246. Ellison and Oracle maintain close ties to Stanford University that prevent Boskin from independently evaluating matters concerning Ellison. For example, as recounted by the Delaware Court of Chancery in connection with prior derivative litigation regarding Oracle, the Ellison Medical Foundation (now re-named The Lawrence Ellison Foundation) has made approximately $10 million in grants to Stanford.

The directors with ties to Stanford University may believe that their continued employment there or service on boards and committees result in part from such donations to Stanford and thus, those directors may not be able to act independently from (or adversely to) Oracle (and Ellison).

247. Additionally, Boskin, is a Senior Fellow and Steering Committee member of the Stanford Institute for Economic Policy Research ("SIEPR"), to which Oracle has consistently made yearly donations of between $5,000 and $20,000.

248. In addition to his professional ties through Stanford and the SIEPR, Boskin is also a personal friend of Ellison. Boskin made a $500,000 donation to the UC Davis Health System, the hospital that repaired Ellison's shattered elbow after a 1992 high-speed bicycle crash and where Ellison established the Lawrence J. Ellison Ambulatory Care Center. When Boskin was injured in a 1999 car accident, a media report described Ellison as a "constant visitor," bringing sushi to Boskin's hospital room.

**8. Director Chizen**

249. Director Chizen is not independent of Defendant Ellison, and by extension Defendant Catz, due to his lucrative compensation as a director and his ties to Stanford University.

250. Director Chizen has received and will continue to receive substantial compensation as a director of Oracle. Since 2009, Director Chizen has received over $7.1 million in cash and stock awards — a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years. As a member of one of the highest compensated board of directors in the United States, Director Chizen expects to receive roughly half of a million dollars or more per year as a director.

251. Chizen has ties to Stanford, which render him further non-independent. Chizen was featured as a speaker in a Stanford course offered on Cloud computing (as a collaboration between The Stanford Center for Professional and the Stanford Computer

Science Department), which was taught by former Oracle On Demand president Timothy Chou (whose bio lists him as having been a leader in bringing enterprises to the cloud since 1999, when he returned to Oracle to work for Ellison). The Chizen Family Foundation, of which Chizen is President and a Director, has donated to Stanford Hospital in at least 2013 and 2014.

**9. Director Garcia-Molina**

252. Director Garcia-Molina is not independent of Defendant Ellison, and by extension Defendant Catz, due to his lucrative compensation as a director and Ellison's ties to his employer, Stanford University.

253. Director Garcia-Molina has received and will continue to receive substantial compensation as a director of Oracle. Since 2005, Director Garcia-Molina has received over $5.3 million in cash and stock awards — a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years. As a member of one of the highest compensated board of directors in the United States, Director Garcia-Molina expects to receive roughly half of a million dollars or more per year as a director.

254. Garcia-Molina has been the Leonard Bosack and Sandra Lerner Professor in the departments of Computer Science and Electrical Engineering at Stanford University since 1995 and served as chairman of the department of Computer Science from 2001 to 2004. He has been a professor at Stanford University since 1992. From 1994 until 1997 he was the director of the Computer Systems Laboratory at Stanford University.

255. Garcia-Molina is employed at Stanford University, which has close ties to Ellison and Oracle as cited above.

**10. Director Panetta**

256. Director Panetta is not independent of Defendant Ellison, and by extension Defendant Catz, due to his lucrative compensation as a director and his close ties to

Ellison and his family.

257. Director Panetta has received and will continue to receive substantial compensation as a director of Oracle. As a member of one of the highest compensated board of directors in the United States, Director Panetta expects to receive roughly half of a million dollars or more per year as a director. Since 2015, Director Panetta has received over $2 million in cash and other stock awards — a material amount to any individual, especially when that person expects to receive about a half of a million dollars per year in subsequent years.

258. Panetta also has ties to Ellison and Ellison's daughter, Margaret Elizabeth Ellison ("Megan Ellison"), which prevents Panetta from acting independently of Ellison. Panetta played an important role in the development of the Megan Ellison-funded film, "Zero Dark Thirty," which chronicles the hunt for and ultimate Navy SEAL raid leading to the death of Osama bin Laden. Prior to Osama bin Laden's death, Megan Ellison had signed on to provide all the financing on a movie directed by Kathryn Bigelow ("Bigelow") and produced by Mark Boal ("Boal") about an unsuccessful mission to kill Osama bin Laden. Before filming began and the script was still in development, it was announced that Osama bin Laden had been killed. According to declassified internal CIA documents obtained by Vice News pursuant to a Freedom of Information Act request, only days after the news broke, Boal was in contact with Panetta (who was the Director of the CIA from 2009 to 2011), and Panetta personally offered to help Boal (who was writing the screenplay) with unprecedented access to CIA information and remained in close contact throughout the filmmaking process.

259. Additionally, according to a draft of a Pentagon inspector general's report: "Leon Panetta was fully cooperating with the movie project and that several CIA staff used White House approved talking points to talk to Mr. Boal about the intelligence that led to UBL's [Usama bin Laden's] location." Draft Report of the Inspector General United States Department of Defense at 4 (*available at* http://pogoarchives.

org/m/go/ig/dod-ig-fouo-draft-report.pdf (last visited June 21, 2020)). The draft report also stated that "Panetta wants the Department to cooperate fully with the makers of the UBL film." *Id*. at 7. Megan Ellison not only provided the financing for "Zero Dark Thirty," but was also heavily involved in its pre- and post-production: she consulted regularly with Bigelow and Boal during development; she was instrumental in the dogged pursuit of casting the film's lead actress, Jessica Chastain (who ultimately won an Oscar for her role); she was on set on location during filming; and she became close with the film's actors. Megan Ellison (through her company Annapurna Productions) covered the entire approximately $45 million budget for "Zero Dark Thirty." While several U.S. senators, including Senator Dianne Feinstein (D-CA) and then Senators John McCain (R-AZ), Mark Udall (D-CO), and Carl Levin (D-MI), openly criticized the movie (Senator Feinstein was so "incensed" she walked out of an advance screening after only 15-20 minutes), Panetta came to its defense. During an interview, Panetta, who was portrayed by James Gandolfini in the movie, stated, "It's a movie. And it's a good movie." Panetta continued "I think people ought to make their own judgments. There are parts of it that give you a good sense of how the intelligence operations do work. But I also think people in the end have to understand that it isn't a documentary, it's a movie."

260. Given these standing ties to Ellison alleged herein, Panetta was unable to independently consider the claims asserted herein or otherwise consider matters pertaining to Ellison or his handpicked executives.

## X. CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–30

261. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

262. The Individual Defendants and Does 1–30 owed and owe the Company

fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

263. The Individual Defendants and Does 1–30, and each of them, as a result of the facts alleged herein, violated and breached their fiduciary duties of candor, good faith, and loyalty.

264. As a direct and proximate result of the Individual Defendants' and Does 1–30's breaches of their fiduciary obligations, the Company has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, defendants are liable to the Company.

**COUNT II**
**Aiding and Abetting Breach of Fiduciary Duty**
**Against All Individual Defendants and Does 1–30**

265. Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

266. Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to the Company.

267. The Individual Defendants owed the Company certain fiduciary duties as fully set out herein. By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to the Company.

268. Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties. Each of the Individual Defendants knew about or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

269. The Company was injured as a direct and proximate result of the aforementioned acts.

**COUNT III**
**Abuse of Control**
**Against Defendants Ellison and Catz**

270. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

271. By virtue of their positions and financial holdings at Oracle, defendants Ellison and Catz exercised control over Oracle and its operations, and owed duties as controlling persons to Oracle not to use their positions of control for their own personal interests and contrary to Oracle's interests.

272. Defendants' conduct alleged herein constitutes an abuse of their ability to control and influence the Company, for which they are legally responsible.

273. As a result of defendants' abuse of control, the Company has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

274. Because the acts of defendants named herein, and each of them, were done maliciously, oppressively, and with intent to defraud, Plaintiff on behalf of the Company is entitled to punitive and exemplary damages in an amount to be shown according to proof at the time of trial.

**COUNT IV**
**Unjust Enrichment**
**Against All Individual Defendants and Does 1–30**

275. Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

276. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

277. During the Relevant Period, the Individual Defendants either received annual stipends, bonuses, stock options, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

278. Plaintiff, as shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

279. Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT V**
**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**Against All Individual Defendants**

280. Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

281. SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

282. Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2018 & 2019 Proxy Statements. The 2018 & 2019 Proxy Statements contained proposals to the Company's stockholders urging them to reelect the members of the Board, approve executive pay packages, and vote against stockholder proposals for the

Company to adopt a Pay Equity Report and to appoint an independent Chairman. The 2018 & 2019 Proxy, however, misstated or failed to disclose the following information, among others:

(a) the deficiencies in the Company's internal and disclosure controls that were known to the Board when the 2019 Proxy was filed;

(b) the fact that the Company was not "committed to diversity and inclusion in our workforce," and was in fact discriminating against Black and minority candidates with respect to hiring, promotion, and pay, and that the Company's conduct constituted illegal busines practices prohibited by federal and state law;

(c) that it was not true that "Oracle promotes equality through our hiring, pay and promotions processes";

(d) Defendants did not believe, and it was not true, that "Relatively few global companies have publicized their internal pay data and it does not appear to have had any additional beneficial effect. We believe the creation and publication of a pay equity report as requested by this proposal would be costly and time-consuming and, in light of our long-standing efforts in this area, would not lead to meaningful gains in support of workforce diversity and gender pay equity"; and

(e) the Defendants did not believe, and it was not true, that "our lead independent director role, as well as our other corporate governance practices, already provide the independent leadership and management oversight requested by this proposal [to require an independent Chairman]."

283. The Defendants knew of, but failed to disclose, fraudulent business practices at Oracle that put the Company at material risk — namely, discriminatory hiring and compensation practices. Had this information been disclosed, shareholders would not have voted to reelect Board members, approve executive compensation

packages, and reject an independent board chairman.

284. By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendation to reelect the current Board and vote against stockholder proposals for the Company to adopt a policy to require the Company to prepare and publish a Pay Equity Report and a policy to require an independent Chairman of the Board.

285. Plaintiff, on behalf of the Company, seeks injunctive and equitable relief because the conduct of the Individual Defendants interfered with Plaintiff's voting rights and choices at the 2019 annual meeting. Plaintiff does not seek any monetary damages for the proxy law violations.

286. This action was timely commenced within three years of the date of the 2018 Proxy and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Company, requests judgment and relief as follows:

A. Against all of the Defendants, jointly and severally, and in favor of the Company for the amount of damages sustained by the Company along with pre- and post-judgment interest as allowed by law resulting from Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement, and violation of the federal proxy laws;

B. Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging

events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

(1) a proposal to require at least three current Directors to resign from the Board and setting forth a resolution to replace such Directors with two Black persons and one other minority;

(2) a proposal to replace Larry Ellison as Chairman with a non-executive director who is independent;

(3) all Director Defendants named in this suit should return all their 2020 compensation received from Oracle (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of Black people and minorities in corporate America;

(4) publication of an annual Diversity Report that contains particularized information and the hiring, advancement, promotion, and pay equity of all minorities at Oracle;

(5) creation of a $700 million fund to hire Black and minority employees, promote them to more management positions at the Company, establish and maintain a mentorship program at Oracle for Black and minority employees that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(6) requirement of annual training of Oracle's entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics;

(7) immediately setting specific goals with respect to the number of Black and minority candidates to hire at the Company over the next five years,

and Oracle should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals;

(8) replacement of Ernst & Young as its auditor. Oracle is one of E&Y's largest customers, and E&Y has served as Oracle's auditor ***since 2002***, giving rise to a cozy and clubby relationship between E&Y and Oracle which is not conducive to effective auditing. The Company's compliance with its stated policies concerning the alleged commitment to diversity has been abysmal to the point of being basically non-existent. The very purpose of an auditor is to assess the Company's internal controls and determining if they are functioning effectively. Rather than doing so, Ernst & Young has wrongfully and consistently given Oracle's internal controls a clean bill of health and has failed to point out the obvious – that Oracle lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment;

(8) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater non-controlling shareholder input into the policies and guidelines of the Board;

(9) a proposal to strengthen Oracle's oversight of its procedures regarding the termination of employees, executives, and board members accused of discrimination;

(10) a proposal to strengthen internal controls concerning discrimination;

(11) a proposal to eliminate the use of Non-Disclosure Agreements at the Company so that current and former employees can report any and all instances of suspected discrimination without threat of legal action; and

(12) a proposal to eliminate the use of mandatory arbitration for

employee disputes and claims of wrongful termination and discrimination.

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Oracle has an effective remedy;

D. Awarding to Oracle restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E. Awarding punitive damages at the maximum amount permitted by law;

F. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of Oracle, hereby demands a trial by jury of all issues that are subject to adjudication by a trier of fact.

Dated: July 10, 2020

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

/s Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile: (858) 914-2002
Email: fbottini@bottinilaw.com
achang@bottinilaw.com
ykolesnikov@bottinilaw.com

RENNE PUBLIC LAW GROUP
Louise H. Renne (SBN 36508)
Ruth M. Bond (SBN 214582)
Ryan McGinley-Stempel (SBN 296182)
350 Sansome Street, Suite 300
San Francisco, CA 94101
Telephone: (415) 848-7200
Facsimile: (415) 848-7230
Email: lrenne@publiclawgroup.com
rbond@publiclawgroup.com
rmcginleystempel@publiclawgroup.com

*Attorneys for Plaintiff Kathleen Dinsmore*

## VERIFICATION

I, Kathleen Dinsmore, verify that I am a shareholder of Oracle Corporation. I have reviewed the allegations in this Verified Shareholder Derivative Complaint. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 7, 2020.



Kathleen Dinsmore